UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Hon. Kevin McNulty |
| v. | : | |
| | : | Criminal No. 13-548 |
| CLAUDE WILLIAMS | : | |
| | : | |

BRIEF OF THE UNITED STATES OF AMERICA
<u>IN OPPOSITION TO THE DEFENDANT'S PRETRIAL MOTIONS</u>

PAUL FISHMAN
UNITED STATES ATTORNEY
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Brief:

OSMAR J. BENVENUTO
COURTNEY M. OLIVA
Assistant United States Attorneys

# **TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT...........................................................................1

TECHNICAL BACKGROUND.........................................................................3

    A.  Cell Phones, Cell-Site Records, and GPS-Location Data.................3

    B.  Statutory Background..................................................................5

STATEMENT OF FACTS..............................................................................11

    A. The Investigation.......................................................................11

        1.    The First Five Armed Robberies.......................................11

        2.    The FBI Independently Identifies Claude Williams.............13

        3.    The FBI Obtains Judicial-Approval for a Pen Register........14

        4.    The FBI Seeks Judicial Authorization for an Additional Investigative Technique.....................................................15

        5.    Judge Falk Finds Probable Cause and Issues a Search Warrant...........................................................................18

        6.    The FBI Obtains Judicial Approval to Install a GPS-Tracker on Claude Williams's Vehicle........................21

    B. The Arrest..................................................................................22

    C. Mr. Williams' Post-Arrest Statements..........................................23

LEGAL ARGUMENT....................................................................................30

I.     ESTABLISHED THIRD CIRCUIT AND SUPREME COURT CASE LAW PERMITS THE GOVERNMENT TO OBTAIN HISTORICAL CELL-SITE RECORDS PURSUANT TO A 2703(d) ORDER...............30

A. Binding Third Circuit Case Law Permits the Government to Obtain Cell-Site Records Under 2703(d), as Have Other Federal Circuit Courts.......................................................................................31

B. There is No Reasonable Expectation of Privacy in Cell-Site Records under the Supreme Court's Third-Party Doctrine ..........37

    1. A Customer Has No Reasonable Expectation of Privacy in Historical Cell-Site Records...............................................38

    2. Compulsory Process Is Subject to a Reasonableness Standard, Not a Warrant Standard....................................45

    3. The Eleventh Circuit's Decision—Which Has Been Vacated—Is Contrary to Long-Established Supreme Court Precedent..................................................................47

C. The Court Need Not Decide Whether the Fourth Amendment Prohibits the Government From Obtaining Cell-Site Records Because the Search Warrant—Independent of the Cell-Tower Records—Established Probable Cause......................................51

II.    THE GOVERNMENT LAWFULLY OBTAINED REAL-TIME CELL-SITE RECORDS PURSUANT TO A 2703(d) ORDER AND, JUST A FEW DAYS LATER, PURSUANT TO A SEARCH WARRANT.....................................................................................55

A. The Motion to Suppress Real-Time Cell-Site Records Obtained by 2703(d) Order Is Moot and Has No Merit.............56

B. The Affidavit Submitted in Support of the Rule 41 Search Warrant Established Probable Cause to Obtain Real-Time Cell-Site Records......................................58

III.    THE GOVERNMENT USED THE MOBILE EQUIPMENT PURSUANT TO A VALID RULE 41 SEARCH WARRANT....................62

A. The Search Warrant Affidavit More Than Adequately Described the Capabilities of the Mobile Equipment................62

B. No Basis Exists for a *Franks* Hearing......................................66

1.  The Search Warrant Affidavit Does Not Contain Any Material Omissions Related to Prior Applications or Orders........................................................................67

2.  The Search Warrant Affidavit Does Not Contain Any Material Misleading Statements or Omissions Related to the Mobile Equipment....................................72

C.  The Defendant's Motion for Additional Discovery Regarding the Mobile Equipment Should be Denied................74

IV.  THE GOOD-FAITH EXCEPTION TO THE EXCLUSIONARY RULE WOULD APPLY HERE...................................................................76

V.  THERE HAS BEEN NO *MIRANDA* VIOLATION, AND CLAUDE WILLIAMS' POST-ARREST STATEMENTS SHOULD BE ADMITTED.....................................................................................77

A.  Suspect Must Clearly and Unequivocally Invoke the Right to Counsel..........................................................................78

1.  The Key Inquiry is Whether a Suspect's Reference to Counsel is Clear or Ambiguous....................................79

2.  Courts Must Consider the Context Within Which the Statement is Made.......................................................81

B.  Claude Williams' Statements Regarding Counsel Were Ambiguous.........................................................................82

1.  The Defendant's First Statement Regarding Counsel Was Ambiguous............................................................83

2.  The Defendant's Second Statement Regarding Counsel Was Ambiguous............................................................87

C.  In the Alternative, if the Court Holds that a *Miranda* Violation Has Occurred, the Defendant's Statements Made Prior to His First Reference to Counsel Should Be Admitted.......................................................................91

VI.  LAW ENFORCEMENT DID NOT COERCE CLAUDE WILLIAMS' POST-ARREST STATEMENTS AND THOSE STATEMENTS SHOULD THEREFORE BE ADMITTED....................92

iv

A.  A Confession Must Be Voluntary To Be Admissible..............92

    1.  Courts Must Consider the Totality of the Circumstances  When Deciding Whether a Statement is Voluntary...................................................93

    2.  Law Enforcement is Entitled to Employ Psychological Tactics.......................................................................95

B.  Claude Williams' *Miranda* Waiver Was Lawfully Obtained........97

C.  Claude Williams' Statements Were Made Voluntarily and Were Not the Product of Coercion....................................98

VII.  CLAUDE WILLIAMS' STATEMENTS MADE DURING THE BOOKING PROCESS SHOULD BE ADMITTED AS SPONTANEOUS AND VOLUNTARY    STATEMENTS.......................................................102

A.  The Fruit-of-the-Poisonous-Tree Doctrine Does Not Apply to *Miranda* Violations.................................................102

B.  Numerous Courts Have Refused to Suppress Subsequent, Spontaneous Statements Made by a Suspect Who Earlier Was Questioned in Violation of *Miranda*..............................104

C.  Claude Williams' Statements Made During the Booking Process Should Be Admitted.................................................106

VIII.  THE REQUEST FOR EARLY JENCKS SHOULD BE DENIED..........107

IX.  THE DEFENDANT IS NOT ENTITLED TO ROUGH NOTES.............108

X.  THE DEFENDANT IS NOT ENTITLED TO A *JAMES* HEARING........109

A.  Co-Conspirator Statements Are Admissible as Non-Hearsay...108

B.  The Third Circuit Has Never Required a Pre-Trial *James* Hearing..............................................................111

XI.  THE DEFENDANT'S *BRADY* AND *GIGLIO* MOTION IS MOOT...................................................................113

XII.  ANY FURTHER MOTIONS SHOULD BE LIMITED TO ADDITIONAL DISCOVERY............................................................115

CONCLUSION....................................................................116

## TABLE OF AUTHORITIES

**PAGE**

### Cases

*Alston v. Redman,*
   34 F.3d 1237 (3rd Cir. 1994).........................................................................78

*Bourjaily v. United States,*
   483 U.S. 171 (1987).....................................................................................108

*Boretsky v. Ricci,*
   Civil No. 09-0771 (FLW), 2012 U.S. Dist. LEXIS 26447
   (D.N.J. Feb. 29, 2012)..............................................................................79-81

*Colorado v. Connelly,*
   479 U.S. 157 (1986).......................................................................................93

*Commonwealth of Puerto Rico v. United States,*
   490 F.3d 50 (1st Cir. 2007).............................................................................19

*Connecticut v. Barrett,*
   479 U.S. 523 (1987).......................................................................................79

*Dalia v. United States,*
   441 U.S. 238 (1979).................................................................................64, 65

*Davis v. United States,*
   131 S. Ct. 2419 (2011)...................................................................................76

*Davis v. United States,*
   512 U.S. 452 (1994).......................................................................................77

*Dickerson v. United States,*
   530 U.S. 428 (2000).......................................................................................92

*Edwards v. Arizona,*
   451 U.S. 477 (1981).......................................................................................77

*Flamer v. Delaware,*
   68 F.3d 710 (3rd Cir. 1995)............................................................................78

*Franks v. Delaware*,
  438 U.S. 154 (1978) ............................................................ 65, 66

*Frazier v. Cupp*,
  394 U.S. 731 (1969) ................................................................... 94

*In re Matter of the Appl. of the U.S. for an Order Directing a Provider
  of Elec. Commc'n Serv. to Disclose Records to the Gov't*,
  620 F.3d 304 (3d Cir. 2010) ...................................................... 31

*Halsey v. Pfeiffer*,
  750 F.3d 273 (3rd Cir. 2014) ..................................................... 91

*Henderson v. Hendricks*,
  2005 U.S. Dist. LEXIS 32897
  (D.N.J. Dec. 13, 2005) .............................................................. 91

*Herring v. United States*,
  555 U.S. 135 (2009) ................................................................... 76

*United States v. Higgs*,
  713 F.2d 39 ............................................................. 108, 113-115

*Illinois v. Gates*,
  462 U.S. 213 (1983) ................................................................... 58

*Illinois v. Krull*,
  480 U.S. 340 (1987) ................................................................... 84

*In re Appl. of U.S. for an Order for Prospective Cell-Site Location
  Information on a Certain Cellular Telephone*,
  460 F. Supp. 448 (S.D.N.Y. 2006) ........................................ 36, 53

*In re Appl. of U.S. for Historical Cell-Site Data*,
  724 F.3d 600 (5th Cir. 2013) ..................................................... 38

*In re Appl. of U.S. for an Order for Disclosure of Telecommunications
  Records and Authorizing the Use of a Pen Register and Trap and Trace*,
  405 F. Supp. 2d 435 (S.D.N.Y. 2005) ........................................ 62

*In Re the City of New York*,
  607 F.3d 923 (2d Cir. 2010) ..................................................... 19

*In re Subpoena Duces Tecum,*
   228 F.3d 341 (4th Cir. 2000) ................................................................ 46

*LaFevers v. Gibson,*
   182 F.3d 705 (10th Cir. 1999) .............................................................. 86

*Locust v. Ricci,*
   Civ. No. 08-2713 (SRC), 2011 U.S. Dist. LEXIS 142871
   (D.N.J. Dec. 12, 2011) ........................................................................ 92

*Matthews v. McKee,*
   Civ. No. 06-15253, 2009 U.S. Dist. LEXIS 4454
   (E.D. Mich. Jan. 22, 2009) .................................................................. 82

*McNeil v. Wisconsin,*
   501 U.S. 171 (1991) ............................................................................ 78

*Medeiros v. Shimoda,*
   889 F.2d 819 (9th Cir. 1989) .............................................................. 104

*Miller v. Fenton,*
   796 F.2d 598 (3rd Cir. 1986) ................................................................ 92

*Miranda v. Arizona,*
   384 U.S. 436 (1966) ............................................................................ 77

*Murray v. United States,*
   487 U.S. 533 (1988) ............................................................................ 52

*Muhammad v. New Jersey,*
   No. 05-0296, 2007 U.S. Dist. LEXIS 12247
   (D.N.J. Feb. 21, 2007) ........................................................ 79, 88-89, 108

*North Carolina v. Butler,*
   441 U.S. 369 (1979) ............................................................................ 77

*Oklahoma Press Publishing Co. v. Walling,*
   327 U.S. 186 (1946) ............................................................................ 45

*Oregon v. Elstad,*
   470 U.S. 298 (1985) .......................................................................... 101

*Palermo v. United States,*
   360 U.S. 343 (1959) .......................................................................... 106

*Pena v. McDonald,*
  Civ. No. 09-976, 2012 U.S. Dist. LEXIS 22057
  (C.D. Cal. Jan. 6, 2012) ........................................................... 87

*Pena v. Prelesnik,*
  Civ. No. 11-450, 2013 U.S. Dist. LEXIS 184265
  (W.D. Mich. Aug. 12, 2013) ..................................................... 82

*United States v. Powell,*
  943 F. Supp. 2d 759 (E.D. Mich. 2013) .................................... 60

*Rhode Island v. Innis,*
  446 U.S. 291 (1980) ................................................................ 103

*Riley v. California,*
  134 S. Ct. 2473 (2014) ............................................................. 35

*Roviaro v. United States,*
  77 U.S. 623 (1956) ................................................................... 81

*Schneckloth v. Bustamonte,*
  412 U.S. 218 (1973) ................................................................. 93

*Scott v. Martel,*
  Crim. No. 12-0717, 2013 U.S. Dist. LEXIS 53194
  (N.D. Cal. April 12, 2013) ....................................................... 81

*Sherwood v. Mulvihill,*
  113 F.3d 396 (3d Cir. 1997) ..................................................... 66

*Smith v. Illinois,*
  469 U.S. 91(1984) .................................................................... 78

*Smith v. Maryland,*
  442 U.S. 735 (1979) ................................................... 35, 40, 45

*Sweet v. Tennis,*
  386 Fed. App'x 342 (3rd Cir. 2010) .......................................... 91

*U.S. Telecom. Ass'n v. FCC,*
  277 F.3d 450 (D.C. Cir. 2000) ................................................ 8, 9

*United States v. Abdulla,*
  294 F.3d 830 (7th Cir. 2002) .................................................. 104

*United States v. Ammar,*
   714 F.2d 238 (3rd Cir. 1983)..................................................................... 107

*United States v. Arterberry,*
   Crim. No. 99-21183, 2001 U.S. App. LEXIS 32262
   (5th Cir. Apr. 20, 2001) ................................................................... 96, 101

*United States v. Bobb,*
   471 F.3d 491 (3rd Cir. 2006).................................................................... 108

*United States v. Bonner,*
   469 Fed. App'x 119 (3d Cir. 2012) ......................................................... 104

*United States v. Booker,*
   543 U.S. 220 (2005) .................................................................................. 36

*United States v. Brown,*
   3 F.3d 673 (3d Cir. 1993) .......................................................................... 66

*United States v. Brown,*
   303 F.3d 582 (5th Cir. 2002)................................................................... 107

*United States v. Calisto,*
   838 F.2d 711 (3d Cir. 1988) ..................................................................... 66

*United States v. Christie,*
   624 F.3d 558 (3d Cir. 2010) ..................................................................... 38

*United States v. Cole,*
   315 F.3d 633 (6th Cir. 2003).................................................................. 103

*United States v. Conn. Bank & Trust Co.,*
   1979 WL 1520 (D. Conn. Aug. 9, 1979) .................................................. 44

*United States v. Continental Group, Inc.,*
   603 F.2d 444 (3rd Cir. 1979).................................................................. 110

*United States v. Corbett,*
   750 F.3d 245 (2nd Cir. 2014) ................................................................... 95

*United States v. Cruz,*
   910 F.2d 1072 (3rd Cir. 1990)................................................................ 109

x

*United States v. Davis,*
754 F.3d 1205 (11th Cir. 2014) ................................................46, 47, 50, 100

*United States v. Davis,*
--- Fed. App'x --- (11th Cir. Sept. 4, 2014) ................................................. 47

*United States v. Davis,*
Crim. No. 05-54, 2006 U.S. Dist. LEXIS 3591
(D. Del. Jan. 30, 2006) ................................................................................ 101

*United States v. DePeri,*
778 F.2d 963 (3rd Cir. 1986) ..................................................................... 110

*United States v. DeSumma,*
272 F.3d 176 (3d Cir. 2001) ...................................................................... 102

*United States v. Fautz,*
812 F. Supp. 2d 570 (D.N.J. 2011) ........................................................... 104

*United States v. Forest,*
355 F.3d 942(6th Cir. 2004), ........................................................................ 36

*United States v. Forrester,*
512 F.3d 500 (9th Cir. 2007) ........................................................................ 44

*United States v. Frost,*
999 F.2d 737 (3d Cir. 1993) ................................................................... 65, 66

*United States v. Gambino,*
926 F.2d 1355 (3rd Cir. 1991) ................................................................... 110

*United States v. Gibbs,*
739 F.2d 838 (3rd Cir. 1984) ..................................................................... 109

*United States v. Graham,*
846 F. Supp. 2d 384 (D. Md. 2012) ................................................... 8, 39, 97

*United States v. Graham,*
Crim. No. 13-00011, 2014 U.S. Dist. LEXIS 88796
(N.D. Ga. May 28, 2014) .................................................................. 98-99, 101

*United States v. Harrison,*
689 F.3d 301 (3d Cir. 2013) ........................................................................ 34

*United States v. Herrold,*
   962 F.2d 1131 (3d Cir. 1992) ............................................................ 51, 52

*United States v. Hunter,*
   708 F.3d 938 (7th Cir. 2013) ...................................................... 79, 80, 85

*United States v. James,*
   590 F.2d 575 (5th Cir. 1979).................................................................. 109

*United States v. Jones,*
   132 S. Ct. 945 (2012) ............................................................................... 34

*United States v. Jones,*
   994 F.2d 1051 (3d Cir. 1993) ................................................................... 58

*United States v. Kenny,*
   462 F.2d 1205 (3d Cir. 1972) ................................................................. 106

*United States v. McGlory,*
   968 F.2d 309 (3rd Cir. 1992)......................................................... 108, 109

*United States v. Micek,*
   Crim. No. 00-267, 2001 U.S. Dist. LEXIS 937
   (D. Neb. Jan. 23, 2001) ........................................................................... 87

*United States v. Miknevich,*
   638 F.3d 178 (3d Cir. 2011) .............................................................. 57, 58

*United States v. Miller,*
   425 U.S. 435 (1976) ..................................................................... 40, 41, 42

*United States v. Muhammad,*
120 F.3d 688 (7th Cir. 1997) ...................................................................... 121

*United States v. Murphy,*
   569 F.2d 771(3d Cir. 1978) ................................................................... 106

*United States v. Nixon,*
   418 U.S. 683 (1974) ................................................................................. 46

*United States v. Ordaz,*
   398 F.3d 236 (3d Cir. 2005) ................................................................... 31

*United States v. Pace,*
    898 F.2d 1218 (7th Cir. 1990)...................................................... 70

*United States v. Pettigrew,*
    468 F.3d 626 (10th Cir. 2006)................................................... 104

*United States v. Price,*
    558 F.3d 270 (3d Cir. 2009) ...................................................... 51

*United States v. R. Enterprises,*
    498 U.S. 292 (1991) .................................................................. 45

*United States v. Reyes,*
    798 F.2d 380 (10th Cir. 1986).................................................. 109

*United States v. Richardson,*
    265 Fed. App'x 52 (3rd Cir. 2008) ........................................... 96

*United States v. Rigmaiden,*
    2013 WL 1932800 (D. Ariz. May 8, 2013) ................................. 74

*United States v. Rigmaiden,*
    844 F. Supp. 2d 982 (D. Ariz. 2012) ................................... 81, 82

*United States v. Romano,*
    Civ. No. 12-691, 2013 U.S. Dist. LEXIS 133613
    (E.D.N.Y. Sept. 18, 2013) ................................................. 96, 101

*United States v. Serrano,*
    2014 WL 2696569 (S.D.N.Y. June 10, 2014) ............................. 31

*United States v. Sierra-Estrada,*
    248 Fed. App'x 973 (9th Cir. 2007)........................................... 80

*United States v. Smith,*
    No. 13-CR-20263, 2013 U.S. Dist. LEXIS 151899
    (E.D. Mich. Oct. 23, 2013).......................................................... 80

*United States v. Stabile,*
    633 F.3d 219 (3d Cir. 2011) .............................................. 56, 58

*United States v. Starusko,*
    729 F.2d 256 (3d Cir. 1984)..................................... 106, 112, 113

*United States v. Stern,*
597 F.3d 540 (3d Cir. 2010) ....................................................... 33

*United States v. Swint,*
15 F.3d 286 (3rd Cir. 1994) .................................................. 93, 94

*United States v. Thomas,*
878 F.2d 383 (6th Cir. 1989) ...................................................... 43

*United States v. Van Horn,*
789 F.2d 1492 (11th Cir. 2012) .......................................... 19, 74

*United States v. Vella,*
562 F.2d 275 (3rd Cir. 1977) ................................................... 107

*United States v. Weaver,*
507 F.3d 178 (3rd Cir. 2007) .................................................. 109

*United States v. Wiley,*
132 Fed. App'x 635 (6th Cir. 2005) .......................................... 95

*United States v. Williams,*
264 F.3d 561 (5th Cir. 2001) ................................................... 110

*Walton v. Falk,*
No. 13-cv-403, 2014 U.S. Dist. LEXIS 61308
(D. Colo. May 1, 2014) ............................................ 80, 86-87-91

## **Statutes**

18 U.S.C. § 2511 ......................................................................... 72

18 U.S.C. § 2703 ......................................................................... 76

18 U.S.C. § 2703(c)(1) .................................................................. 6

18 U.S.C. § 2703(c)(1)(A) ........................................................... 18

18 U.S.C. § 2703(d) ....................................................................... 6

18 U.S.C. § 2705(a) ....................................................................... 7

18 U.S.C. § 3121 ............................................................................ 7

18 U.S.C. § 3122 ..................................................................... 14

18 U.S.C. § 3123(a)(1) .......................................................... 10

18 U.S.C. § 3500 ......................................................... 105, 106

18 U.S.C. § 371 ......................................................................... 2

18 U.S.C. § 924(c)(1)(A) ......................................................... 2

18 U.S.C. § 2113(a) .................................................................. 2

18 U.S.C. §§ 2701-2712 .......................................................... 5

47 U.S.C. § 1002(2)(B) .......................................................... 36

47 U.S.C. § 1002(a)(2)(B) ........................................................ 9

**Rules**

Fed. R. Crim. P. 41 ........................................................... 16, 17

Fed. R. Evid. 801(d)(2)(E) ................................................... 108

**Regulations**

47 C.F.R. § 42.6 ................................................................ 8, 39

**Miscellaneous**

Federal Communications Commission, Enhanced 9-1-1 – Wireless Services, *available at http://www.fcc.gov/encyclopedia/enhanced-9-1-1-wireless-services* (last visited Aug. 24, 2014)...................................................5

Orin Kerr, *Cell Phones, Magic Boxes, and the Fourth Amendment*, The Volokh Conspiracy, *http://www.volokh.com/2010/11/08/cell-phones-magic-boxes-and-the-fourth-amendment/* (last visited Aug. 22, 2014)...........................................................................42

Orin Kerr, Eleventh Circuit, Disagreement with the Fifth, Holds Fourth
Amendment Protects Cell-Site Records, *available at*
*http://www.washingtonpost.com/news/volokh-*
*conspiracy/wp/2014/06/11/eleventh-circuit-disagreeing-with-the-fifth-holds-*
*fourth-amendment-protects-cell-site-records/* (last visited Aug. 24,
2014)......................................................................................................41

Sprint, Customer Privacy FAQs, *available at*
*http://newsroom.sprint.com/consumer-resources/customer-privacy-*
*faqs.htm#How is my device location info used* (last visited Sept. 2, 2014)........44

Sprint, E911 *available at*
*http://www.sprint.com/business/newsletters/articles/e911*
*where_federal01.html* (last visited Aug. 24,
2014)........................................................................................................5

Orin Kerr, Eleventh Circuit, Disagreement with the Fifth, Holds Fourth
Amendment Protects Cell-Site Records, *available at*
*http://www.washingtonpost.com/news/volokh-*
*conspiracy/wp/2014/06/11/eleventh-circuit-disagreeing-with-the-fifth-holds-*
*fourth-amendment-protects-cell-site-records/* (last visited Aug. 24,
2014)......................................................................................................41

The United States of America respectfully submits this Memorandum of Law in opposition to the pretrial motions of defendant Claude Williams ("Mr. Williams" or the "defendant"), filed on August 20, 2014, including his (1) Omnibus Motion; (2) Motion to Suppress Cell Tower Dump Data/Historical CSLI; (3) Motion to Suppress Prospective CSLI; (4) Motion to Suppress Cell-Site Location Information Seized by a Stingray/Cell Site Simulator; and (5) Motion to Suppress Statements.

## PRELIMINARY STATEMENT

In a crime spree that lasted close to eleven months, Claude Williams and several coconspirators committed seven armed bank robberies and were apprehended while en route to commit an eighth armed robbery.  In five of these robberies, Mr. Williams physically vaulted the teller counter and pointed his snub-nosed revolver at numerous tellers, while demanding that they give him cash.

Following the seventh armed bank robbery, Mr. Williams was followed by an off-duty police officer.  When Mr. Williams and his coconspirator were unable to lose the officer, Mr. Williams got out of the get-away car, pointed his revolver at the officer, and—while walking towards her—took aim.  Luckily, the officer drove off before Mr. Williams was able to get off a shot, but not before noting the license plate number of the get-away car.

Through the use of judicially-authorized electronic surveillance, including a GPS-tracker placed on his vehicle and historical cell-site records,

1

Special Agents with the Federal Bureau of Investigation ("FBI") were able to apprehend Mr. Williams as he was about to commit the eighth armed robbery. When he was arrested, Mr. Williams was less than a block from the intended target bank; he was wearing a bandana around his neck and a hooded sweatshirt.  Inside the car, agents found his snub-nosed revolver and white latex gloves.  In total, Mr. Williams assaulted dozens of bank employees and netted over $140,000 in cash.

On August 16, 2013, a federal grand jury sitting in Newark returned an Indictment charging Mr. Williams with conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371, seven counts of bank robbery, in violation of 18 U.S.C. §§ 2113(a), 2113(d), one count of attempted bank robbery, 18 U.S.C. § 2113(a), and eight counts of using a firearm in furtherance of a crime of violence, 18 U.S.C. § 924(c)(1)(A).

2

## **TECHNICAL BACKGROUND**

### **A. Cell Phones, Cell-Site Records, and GPS-Location Data**

Cellular telephone networks provide service to their customers through tower antennas deployed across the cell phone provider's coverage area.  When the user places or receives a call, a radio signal is transmitted between the phone and a nearby tower antenna, which depends on a local switch for routing.  For each communication that a cell phone makes, its cellular provider(s) can typically determine:  (1) the date and time of the communication; (2) the telephone numbers involved; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication.

In addition, many cell towers divide their coverage up into multiple sectors (most often three 120º sectors), with each sector serving a portion of the roughly circular coverage area extending out from the antenna mast.  For many carriers, the three sectors can be visualized as the areas on a clock face from 10 to 2; from 2 to 6; and from 6 to 10.  Where this is the case, the provider can usually identify the sector of the tower that transmitted or received the communication.

The size of a particular cell tower's radius depends on a number of factors, including how close antenna towers are to each other, antenna height,

3

radio-reception range, the topography of the surrounding land, the presence of buildings, or even bodies of water. Spacing between antenna towers varies enormously depending on a number of factors, especially terrain and structural density in the intended coverage area. Cell towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to the cell phone does not necessarily serve every call made to or from that phone.

As a result, whether obtained prospectively or from historical records, cell-site records cannot reveal a phone's exact location. Records of cell-site connections allow law enforcement to determine only the general location of a cell phone, revealing, at best, the particular neighborhood that a cellphone user is in at the time a call starts and at the time it terminates. In fact, the cell-site records that the Government obtained from Sprint for the cell phone used by Mr. Williams provided information about the cell tower handling the call only at the beginning and end of each call.

Cell-site records should not be confused with Global Positioning System ("GPS") technology, Enhanced-911 ("E-911") Phase II data, latitude-longitude data, or "multilateration" data (often referred to informally as "triangulation"). For public-safety reasons, including allowing emergency responders to locate the precise location of a cell phone when it calls 911, the Federal Communications Commission ("FCC") has required cell phone providers to be able to determine the latitude and longitude of a cell phone to a specified

4

degree of accuracy when the phone makes a 911 call.[1]  To comply with these FCC requirements, many cell phone carriers have begun placing GPS-receivers in cell phones that can deliver latitude-longitude location information that is accurate within 10 to 5,000 meters.

Unlike cell-site records, which provide only the location of the cell tower used at the beginning and end of each call, GPS or E-911 data provides much more precise location information than cell-site records.  Indeed, the reason that the FCC and telecommunications industry pushed GPS technology in creating the E-911 initiative is that cell-site records were insufficient to permit emergency responders to locate cell phones that had called 911.

## B. Statutory Background

Congress enacted the Stored Communications Act, 18 U.S.C. §§ 2701-2712 ("SCA"), as part of the Electronic Communications Privacy Act ("ECPA") in 1986 to create a system of statutory privacy rights for customers and subscribers of computer network service providers.  Section 2703 of the SCA, the provision that the defendant now challenges, regulates government access to stored communications by creating a code of criminal procedure that federal

---

[1] *See* Federal Communications Commission, Enhanced 9-1-1 – Wireless Services, *available at http://www.fcc.gov/encyclopedia/enhanced-9-1-1-wireless-services* (last visited Aug. 24, 2014); *see also* Sprint, E911 *available at http://www.sprint.com/business/newsletters/articles/e911where_federal01.html* (last visited Aug. 24, 2014).

5

and state law enforcement officers must follow in order to compel disclosure of stored communications.

Under the SCA, section 2703 distinguishes between "contents" and transactional "record[s]."  Section 2703(a) covers the circumstances in which the Government may require providers to disclose the contents of wire or electronic communications in electronic storage, and section 2703(b) covers the disclosure of the contents of wire or electronic communications held by a remote computing service.  In contrast to "content," section 2703(c)(1) covers the circumstances in which the Government may obtain "a record or other information pertaining to a subscriber to or customer of such service," a term that expressly *excludes* the "contents of communications."

Pursuant to 18 U.S.C. § 2703(c)(1), the United States may require a provider of electronic communication service to disclose "a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications)" when it obtains—from a neutral magistrate judge—a court order for such disclosure pursuant to 18 U.S.C. § 2703(d) (hereinafter, a "2703(d) order").  A 2703(d) order is issued by a court when the Government provides "specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation" (hereinafter, a "2703(d) application").  18 U.S.C. § 2703(d).

6

This standard is "higher than a subpoena, but not a probable cause warrant."  H.R. Rep. No. 103-827(I), at 31 (1996), *reprinted in* 1996 U.S.C.C.A.N. 3489, 3511.

The entity receiving the 2703(d) order may move to quash the order if the records sought are "unusually voluminous . . . or compliance with such order otherwise would cause an undue burden."  18 U.S.C. § 2703(d). When the Government uses a 2703(d) order, it must provide the subscriber with prior notice unless there is reason to believe that such notification may have an adverse result, such as seriously jeopardizing an investigation.  *See* 18 U.S.C. § 2705(a).[2]  In all such cases, the SCA requires that the subscriber must eventually receive notice of the 2703(d) order.

In 1994 Congress enacted the Communications Assistance for Law Enforcement Act ("CALEA"), P.L. 103-313, 108 Stat. 4279 (1994).  One of CALEA's goals at the time it was enacted was to preserve the same surveillance capabilities that law enforcement agencies had prior to the advent of cellphones.  Under the "old" system of hardwired telephones, an order issued under the pen register/trap and trace statute, 18 U.S.C. § 3121 *et seq.* (hereinafter, the "pen/trap statute"), allowed law enforcement to pinpoint the exact physical location of a telephone user each time he or she placed a call

---

[2] Additionally, pursuant to that same section, the Government is allowed to apply to the Court for orders to delay notice to subscriber while an investigation is ongoing.

because landlines, whether payphones or residential telephones, are fixed to a particular address.  *See U.S. Telecom. Ass'n v. FCC*, 277 F.3d 450, 463-64 (D.C. Cir. 2000).  In contrast, cell phones do not require their users to be in a particular place to send and receive calls.  As a result, law enforcement uses cell-site records to determine the approximate physical location of a cell phone.

In accordance with CALEA, a standard (the "J-Standard") was created jointly by the telecommunications industry and the FBI.  The J-Standard "does *not* mandate that cellular providers create or maintain . . . historical cell site location data."  *See United States v. Graham*, 846 F. Supp. 2d 384, 386 n.11 (D. Md. 2012) ("[E]ven courts that have concluded that government acquisition of cumulative cell site location records can violate the Fourth Amendment generally acknowledge that these records are generated in the ordinary course of the provider's business.") (internal quotation marks and citation omitted); *see also* 47 C.F.R. § 42.6 (requiring cell phone carriers to retain "for a period of 18 months . . . the following billing information about telephone toll calls:  the name, address, and telephone number of the caller, telephone number called, date, time and length of the call").  Rather than requiring that cell phone companies retain historical cell-site records, the J-Standard provided only that cell phone companies have the capability to disclose in real-time the physical location of the nearest cell-site tower at the beginning and end of each call, thus allowing law enforcement to maintain the surveillance capability it had before telephones became more mobile.  *Id.* ("In the wireless environment, the

8

equivalent location information is the location of the cell-sites to which the mobile terminal or handset is connected at the beginning and at the termination of the call.") (internal quotation marks and citation omitted). Ultimately, just like their "historical" analogue, "real-time" cell-site records reveal considerably less information about a caller's location than the physical addresses associated with landlines under the "old" hardline system, which would identify the residence or building from which a landline phone was used.

In addition to preserving the surveillance capabilities that law enforcement agencies had prior to the advent of cell phones, CALEA also substantively changed the electronic surveillance statutes to enhance privacy, and did so in two principal ways. *First*, by amending section 2703(d) of the SCA, it created the "articulable facts" required for the Government to obtain a § 2703(d) order for transactional information associated with electronic communications.[3]  *See* 18 U.S.C. § 2703(d)**;** CALEA § 207, P.L. 103-313, 108 Stat. 4279, 4292 (1994).  *Second*, it forbade disclosure of cell-site records by a provider "solely pursuant" to the pen/trap statute.  *See* 47 U.S.C. § 1002(a)(2)(B); CALEA § 207, P.L. 103-313, 108 Stat. 4279, 4280-81 (1994); *see also United States Telecom. Ass'n*, 227 F.3d at 463-64.  This restriction changed the substantive law of pen/trap orders to enhance privacy, by

---

[3] Under the original SCA, prior to CALEA's enactment, a section 2703(d) order could be obtained "if the government entity shows that there is reason to believe . . . the records or other information sought are relevant to a legitimate law enforcement inquiry."  SCA, PL 99-508, 100 Stat. 1848 (1986).

requiring the Government to seek prospective cell-site records pursuant to the dual authority of the pen/trap statute and the SCA with its "articulable facts" requirement.

In contrast, a pen/trap order may issue where the Government has made a mere certification of relevance. *See* 18 U.S.C. § 3123(a)(1).  Section 2703(d), as amended by CALEA, imposes the higher "specific and articulable facts" showing "reasonable grounds" criterion.  Accordingly, section 2703(d), together with the pen/trap statute, allows law enforcement to maintain a capability it has always had—the ability to locate a telephone user at the time a call is made or received on a prospective basis—in the face of changing technology, and consistent with the goals of Congress in enacting CALEA.

## STATEMENT OF FACTS

The Government anticipates that the following facts will be proven at trial.

### A. The Investigation

#### 1. The First Five Armed Robberies

Between September 26, 2011, and May 22, 2012, five different federally-insured banks were robbed at gunpoint.  Based on witness descriptions of the perpetrator and his modus operandi, FBI agents believed that the same perpetrator had committed each of the five bank robberies.  For example, each of the first five robberies was committed by an African-American male wielding a revolver and wearing a bandana over his face, a hooded sweatshirt, and white latex gloves.  During each of the first five robberies, the perpetrator physically vaulted the teller counter.  Based on statements from witnesses and surveillance videos and photos from the banks, agents believed that the perpetrator was working with one or more coconspirators, who would generally enter the bank prior to the robbery to "case" it.  Given the need for coconspirators to coordinate their activity, agents believed that the perpetrator and his coconspirators were almost certainly using cell phones to coordinate their activities at around the time of each robbery.

After the fifth armed robbery on May 22, 2012, without any credible leads, law enforcement applied to the Honorable Michael A. Shipp, then-United States Magistrate Judge, for an order requiring certain cell-phone providers to

11

turn over transactional records showing which cell phone numbers had connected to cell-phone towers closest to each of four victim banks around the time of each robbery.

Commonly referred to as a "tower dump," this investigative tool permits law enforcement to identify potential suspects who may have committed violent crimes across multiple locations, particularly if those locations are relatively distant from each other.  These cell-tower records are analyzed to determine whether any cell phone numbers connected to cell-phone towers close to each of the crime scenes.  By cross-referencing locations relatively distant from each other during narrow time-frames, law enforcement can thereby identify a potential suspect who was in the vicinity of each of the crime scenes within the time-frame of each of the crimes.

Here, the target banks were located in Clifton, Somerset, Somerville, and Piscataway, with the same Piscataway bank having been robbed twice.  Law enforcement requested data for a narrow window around the time of each bank robbery.  Specifically, it sought tower records as follows:

- September 26, 2011 from 9:00 – 10:00 a.m.

- November 21, 2011 from 8:30 – 10:00 a.m.

- February 27, 2012 from 9:00 – 10:00 a.m.

- April 17, 2012 from 10:00 – 11:30 a.m.

Based on the Government's application, *see* Exhibit A (Appl., Mag. No. 12-6079) (annexed to Benvenuto Decl.), Judge Shipp found "specific and

articulable facts showing that there are reasonable grounds to believe that the transaction records from the Target Towers are relevant and material to an on-going criminal investigation," *see* Exhibit B (Order, Mag. No. 12-6079) (annexed to Benvenuto Decl.), and he therefore ordered that the transactional records be turned over.

The cell-tower records that the FBI received from AT&T, MetroPCS, Sprint, T-Mobile, and Verizon were essentially anonymized—the records did *not* contain the names, addresses, or other specific personal identifying information associated with the cell-phone numbers that had connected to the relevant cell towers.  In fact, the spreadsheets produced by these cell phone providers contain only the incoming and outgoing telephone numbers, date and time of the calls using a particular cell tower, a long serial number identifying the cell-phone handset, the duration of the call, and cell-tower information.  In order to have obtained names, addresses, and other personal identifying information, the FBI would have needed to serve additional process on the cell-phone providers.  That was never done here.

Indeed, before the tower dump records were searched or analyzed, the perpetrator committed two additional armed bank robberies, one on June 20, 2012, and the other on July 12, 2012.

### 2. The FBI Independently Identifies Claude Williams

On July 12, 2012, the Unity Bank in Middlesex, New Jersey, was robbed by a black male armed with a revolver and wearing a bandana, a hooded

13

sweatshirt, and latex gloves. As the perpetrator left the bank, an unarmed off-duty police officer observed him get into the back of a green Ford Taurus and crouch down. The officer followed the get-away vehicle, which then attempted to lose the officer. When that proved unsuccessful, the get-away vehicle stopped, the perpetrator got out, pointed his firearm at the officer, and, while walking towards her, took aim. The officer drove off, but noted the license plate number of the get-away vehicle.

After conducting witness interviews, the FBI determined that Claude Williams was the owner of the green Ford Taurus, that he fit the general description of the perpetrator of each of the previous six robberies, and that he used cell phone number (***) ***-3855 (the "Williams Cell Phone").[4]

### 3. The FBI Obtains Judicial-Approval for a Pen Register

Based on these facts, that same night, the U.S. Attorney's Office and the FBI applied to the Honorable Mark Falk, United States Magistrate Judge, for an order under 18 U.S.C. § 3122 authorizing the installation of a traditional pen register and trap-and-trace device on the Williams Cell Phone, *see* Exhibit C (Appl., Mag. No. 12-3678) (annexed to Benvenuto Decl.).[5] A traditional pen register gives law enforcement the ability to monitor in real-time, among other

---

[4] Because this is a publicly-filed brief, the Government is not providing the cell phone number in its entirety.

[5] To protect the privacy of potential Government witnesses, certain information in Exhibits C, E, G, J, and K have been redacted. Of course, unredacted copies are available should the Court wish to inspect them in camera.

14

things, the incoming and outgoing telephone numbers that a particular cell phone is connecting with and the duration of each call.

In the same application, pursuant to the hybrid authority of both 18 U.S.C. §§ 2703(d) and 3122, law enforcement also requested authorization to obtain real-time cell-site records—but *not* GPS, E-911, or other precise location information—for the Williams Cell Phone. *See* Exhibit C (Appl., Mag. No. 12-3678). As discussed earlier, real-time cell-site records show the particular cell phone towers to which the cell phone connects at the beginning and end of each call.

Judge Falk approved the application, finding under 18 U.S.C. § 2703(d) that the Government had shown "specific and articulable facts showing that there are reasonable grounds to believe that real-time location information concerning [the Williams Cell Phone] (including all cell-site location and registration information but not including GPS, E-911, or other precise location information) . . . are relevant and material to the ongoing criminal investigation." *See* Exhibit D (Order, Mag. No. 12-3678) (annexed to Benvenuto Decl.).

### 4. The FBI Seeks Judicial Authorization for an Additional Investigative Technique

The next day, July 13, 2012, fearing the possibility of another armed robbery, law enforcement applied to the Honorable Patty Shwartz, then-United States Magistrate Judge, for permission to use more a robust investigative

15

technique.  *See* Exhibit E (Appl., Mag. No. 12-3092) (annexed to Benvenuto Decl.).  Although Judge Falk was the magistrate judge on criminal duty from Monday, July 9, 2012, through Sunday, July 15, 2012, Judge Falk's chambers directed the Government's application to Judge Shwartz, who was covering for Judge Falk at the time that the Government's application was made.

Law enforcement requested authorization to "deploy a mobile pen register and trap and trace equipment" (hereinafter, the "Mobile Equipment") in order "to determine the general location" of the Williams Cell Phone.  *See* Exhibit E, pg. 1 (Appl., Mag. No. 12-3092).  The Government's application described in detail the Mobile Equipment and the manner in which the FBI intended to use it.  It explained that the Mobile Equipment "mimick[ed] one of Sprint's cell towers to get the [Williams Cell Phone] to connect to it" and then would "display one or more of the paths from which the [Williams Cell Phone]'s signals are received and the strength of those signals."  *Id.* ¶ 3.  Using these signals, the operator of the Mobile Equipment "may determine the location from which the [Williams Cell Phone] is most likely emitting signals," and thus "determine the general location of the [Williams Cell Phone] and of the individual or individuals using [it]."  *Id.* ¶¶ 3-4.

The Government represented that FBI agents would "deploy and use the Mobile Equipment only from locations where they are lawfully present" and would "absent additional lawful authority (*such as a search warrant issued pursuant to Fed. R. Crim. P. 41*), stop using the Mobile Equipment when it leads

16

them to believe that they have identified a single residence or private space within which the [Williams Cell Phone] may be located." *Id.* ¶ 5 (emphasis supplied).

The application further advised the court that the Mobile Equipment "has the potential to intermittently disrupt cellular service to a small fraction of Sprint's wireless customers within its immediate vicinity" and that "[a]ny potential disruption will be brief and minimized by reasonably limiting the scope and duration of [its] use." *Id.* ¶ 6.

Finally, the application explained that "to achieve the investigative objective (i.e., determining the general location of the [Williams Cell Phone]) in a manner that is the least intrusive, data incidentally acquired from phones other than the [Williams Cell Phone] shall not be recorded and/or retained beyond its use to identify or locate the [Williams Cell Phone]." *Id.* ¶ 7.

Authorization to use the Mobile Equipment was sought for a limited period of 14-consecutive days. As was standard practice in the District of New Jersey at that time, this request was made as an application pursuant to 18 U.S.C. § 2703(d), rather than as a search warrant requiring a showing of probable cause, *see* Fed. R. Crim. P. 41.

Because the Government's request was not made as a Rule 41 search warrant—which requires a finding of probable cause—Judge Shwartz placed some limitations on the Government's ability to use the device. Specifically, although Judge Shwartz authorized the FBI to use the device, she ordered that

17

"in no event [shall the FBI] use the mobile equipment, *absent other authority*, to locate the [Williams Cell Phone] in any private place or where they have reason to believe that the [Williams Cell Phone] is in a private place."[6]  *See* Exhibit F, pgs. 4-5 (Order, Mag. No. 12-3092) (annexed to Benvenuto Decl.) (emphasis supplied).

Ultimately, the FBI did not use the Mobile Equipment pursuant to Judge Shwartz's 2703(d) order.  Indeed, given the limit that Judge Shwartz had placed on the FBI's use of the Mobile Equipment, the Government advised Judge Shwartz that same evening that it would be applying for a search warrant, under Rule 41's probable cause standard, allowing the FBI to track the Williams Cell Phone to a single private residence or location.

Judge Shwartz indicated that the Government could present the search warrant application to Judge Falk, who would resume handling criminal duty matters over the weekend.

### 5. Judge Falk Finds Probable Cause and Issues a Search Warrant

Two days later, on Sunday, July 15, 2012, the Government submitted to Judge Falk an application for a search warrant under Rule 41 and 18 U.S.C. §

---

[6] Prior to Judge Shwartz's handwritten change, the order would have permitted the FBI to use the device but "in no event [shall the FBI] use the Mobile Equipment, absent other authority, to locate the [Williams Cell Phone] once it leads them to believe that they have identified a single residence or private space within which the [Williams Cell Phone] may be located." Exhibit F, pgs. 4-5 (Order, Mag. No. 12-3092).

2703(c)(1)(A).  *See* Exhibit G (Affidavit, Mag. No. 12-3679) (annexed to Benvenuto Decl.).  In addition to seeking authorization allowing the FBI to track the Williams Cell Phone to a single private residence or location, the Government's search warrant application sought (A) real-time location information, including cell-site records *and* GPS, E-911, and other precise location data; (B) authorization to use the Mobile Equipment to determine the general location of the Williams Cell Phone; (C) historical local and long distance telephone connection records; (D) information about the phone subscriber's identity; and (E) historical cell-site records during the period from September 25, 2011, the day before the first robbery, through July 14, 2012. *See id.*

The affidavit submitted in support of the search warrant application included several additional facts that were not contained in the 2703(d) application made to Judge Shwartz.  *Compare* Exhibit E, pgs. 3-6 (Appl., Mag. No. 12-3092), *with* Exhibit G, pgs. 4-8 (Affidavit, Mag. No. 12-3679).[7]  In particular, the search warrant affidavit stated that, after the July 12 robbery,

---

[7] With respect to the Mobile Equipment, the search warrant affidavit contained the same description of the equipment that had been provided in the 2703(d) application submitted to Judge Shwartz.  *Compare* Exhibit E, pgs. 6-8 (Appl., Mag. No. 12-3092), *with* Exhibit G, pgs. 9-12 (Affidavit, Mag. No. 12-3679). Both the 2703(d) application and the search warrant affidavit advised that "the FBI considers the Mobile Equipment and its configuration to be Law Enforcement Sensitive.  *See In re the City of New York*, 607 F.3d 923, 942 (2d Cir. 2010); *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 62-64 (1st Cir. 2007); *United States v. Van Horn*, 879, F.2d 1492, 1508 (11th Cir. 1986)."

the off-duty officer "described the Suspect as being an older black male with a shaved head and facial hair" and that "Williams's date of birth is October **, 195*,[8] and based on a public records database, is believed to have a shaved head and facial hair." Exhibit G, ¶¶ 16, 18 (Affidavit, Mag. No. 12-3679). Additionally, the search affidavit explained that, "[b]ased on cell-site information obtained by law enforcement pursuant to an Order issued on June 5, 2012, by the Honorable Michael A. Shipp, United States Magistrate Judge, the [Williams Cell Phone] connected to a cellular telephone tower near the Somerset Savings Bank shortly before it was robbed on November 21, 2011." *Id.* ¶ 19.

Finally, the affiant—an FBI agent with over 15-years' experience who has investigated over 100 bank robberies, *see id.* ¶ 3—explained that "[b]ecause there is more than one individual involved in the bank robberies under investigation, there is a high probability that these individuals utilized cellular telephones in furtherance of their criminal activities, and/or to report to other persons the fruits of their criminal activity." *Id.* ¶ 20. The affiant also explained that "[b]ased upon [his] knowledge, training, and experience, and that of other law enforcement officers with whom [the affiant had] spoken, individuals involved in bank robberies often keep the proceeds from, and tools of, their offense at their home." *Id.* ¶ 33.

---

[8] The Government has redacted the actual date of birth because this brief is publicly filed.

20

Finding that the Government had shown probable cause under Rule 41, Judge Falk signed the search warrant, authorizing the release of the requested records and also allowing the FBI to "determine [the] general location [of the Williams Cell Phone] for a period of 30 days." Exhibit H (Search Warrant, Mag. No. 12-3679) (annexed to Benvenuto Decl.).

### 6. The FBI Obtains Judicial Approval to Install a GPS-Tracker on Claude Williams's Vehicle

On July 20, 2012, the Government submitted to Judge Shwartz a search warrant application seeking authorization to install and use a tracking device on the green Ford Taurus that Mr. Williams and his coconspirator had used in the July 12, 2012, bank robbery.

In addition setting forth the factual background described above, this search warrant affidavit advised Judge Shwartz of the following facts:

> Based on information and records obtained by law enforcement pursuant to a search warrant issued on July 15, 2012, by the Honorable Mark Falk, United States Magistrate Judge, law enforcement determined that the Subject's cell phone connected to cellular telephone towers in the vicinity of the banks robbed on September 26, 2011, November 21, 2011, February 27, 2012, May 22, 2012, and July 12, 2012.
>
> . . . .
>
> After conducting surveillance of the Subject on July 16, 2012, special agents of the Federal Bureau of Investigation observed the Subject Vehicle parked in front of 322 Bond Street in Elizabeth, New Jersey (the "Bond Street residence"). Based on a landlord-tenant lawsuit that the Subject filed in Union County, New

21

Jersey, law enforcement believes that the Subject resides at the Bond Street residence.

On July 16, 2012, special agents of the Federal Bureau of Investigation observed the Subject using the Subject Vehicle. On that date, the Subject was observed leaving the Bond Street residence with three other individuals and driving to an address in Plainfield, New Jersey.

*See* Exhibit J, ¶¶ 19, 21-22 (Affidavit, Mag. No. 12-3114) (annexed to Benvenuto Decl.).

Based on the affidavit, Judge Shwartz issued a search warrant authorizing the FBI, among other things, to install a tracking device on the Ford Taurus and to "maintain, use, monitor, and record the tracking device at any time in the day or night for a period not to exceed 45 days from the date the warrant is issued." *See* Exhibit K (Search Warrant, Mag. No. 12-3114) (annexed to Benvenuto Decl.). Pursuant to the search warrant, FBI agents surreptitiously installed the GPS-tracking device on the defendant's vehicle.

## B. The Arrest of Claude Williams

Based on both physical surveillance and information received from the GPS-tracker, the FBI determined that Mr. Williams and his coconspirators were "casing" an eighth bank on Friday, July 27, and Saturday, July 28, 2012.

On the morning of July 30, 2012, FBI agents and local police officers stopped a Volkswagen Passat station-wagon a short distance from the Unity Bank that Mr. Williams and his coconspirators had been casing. The Passat was being driven by one of his coconspirators. Around his neck, Mr. Williams

22

was wearing a bandana.  Inside the Passat, FBI agents found, among other things, a fully-loaded snub-nosed revolver and white latex gloves.

### C. Mr. Williams' Post-Arrest Statements

On July 30, 2012, following Mr. Williams' arrest, he was transported to FBI offices in Newark, New Jersey.  At approximately 11:30 a.m., an FBI special agent and a detective from the Somerset County Prosecutor's Office (collectively "law enforcement" or "law enforcement officers") began the interview process.[9] First, they gave Mr. Williams verbal *Miranda* warnings, including telling Mr. Williams that (i) he had a right to talk to a lawyer for advice before law enforcement asked him any questions, and (ii) if he decided to answer questions without a lawyer present, he had a right to stop answering at any time.  Second, law enforcement had Mr. Williams read FBI Form FD-395 (the "FBI *Miranda* Form"), which contained the same *Miranda* warnings.  Mr. Williams then read and initialed the FBI *Miranda* Form.  *See* Exhibit M (annexed to Benvenuto Decl.).

Law enforcement then began the interview, which lasted approximately 62 minutes.  At approximately 13 minutes into the interview, Mr. Williams made the first of two references to counsel.  Specifically, he made a reference to counsel during the following exchange:

> JV:     I would like to hear you say I'm willing to

---

[9] The interview was audio recorded, and a copy of the transcript is attached hereto as Exhibit L (annexed to Benvenuto Decl.).

accept responsibilities for – –

CW:     I'm willing to accept for the things that I was doing and whatnot, but um, at the same time, I mean like, you, you gotta like let me be able to like talk to my lawyer, not get myself a thousand years, I mean, I'm old already.  I'm probably going to die anyway.

*See* Exhibit L at 12 (annexed to Benvenuto Decl.).

At approximately 54 minutes into the interview, Mr. Williams made his second reference to counsel during the following exchange:

JV:     I wanted you to be honest with what you did. I mean cause I know what this depicts, and I know what a jury of your peers believes this depicts.  They'd always rather hear it from your mouth.  That you could explain, yes that's me, no that's not me, yes that's me, that I did it for this reason.  I mean, I, I've given you every opportunity.

CW:     Okay, well I'm, I'm sorry that I got them involved in being here or whatever, but ah, they didn't have anything to do that this is all my stupid shit, you know.  And I'm, I'm with my lawyer, I'm willing to sit down and say yeah this is what I did, this is what I did, whatever, you know what I'm saying But don't, don't seem like you all like really trying to help me here.

*See* Exhibit L at 37 (annexed to Benvenuto Decl.).

Throughout the interview, Mr. Williams also made a number of statements either admitting to his role in the bank robberies or attempting to (falsely) absolve his co-conspirators of any responsibility for their roles in the robberies, or both, including the following:

24

- "I believe that you all may…think that other people is involved…but I'm trying to tell you that they weren't;"

- "[A]ll I'm telling you is that the people that you're thinking that were involved with that…they weren't;"

- "I'm willing to…I was getting ready to tell like do it all, if…let them people go;"

- "I'm just so sorry that…they are involved in this like that…I'm telling you…they didn't do nothing;"

- "I'm finished … I already know that;"

- "[A]ll I'm trying to let you all understand…I'm willing to accept responsibilities for my part;"

- "[Y]ou had an inkling of what was gonna go down today;"

- "Well you know what, I'm finished anyway.  I'll do the three.  I, I did;"

- "You know…I'm thinking that, I'm fucked anyway;"

- "I'm willing to…I was getting ready to tell like do it all, if, if, let them people go;"

- "I'm sorry now that I done it, but that my ass is over…My ass is over with;"

- "I'm ready to do what the time that I gotta do;"

- "…but like I said before, nobody else is involved with my stuff.  I did, I did these things, it was my decision;"

- Stating "yes" to the question "[w]as your intent to day to rob the bank in North Plainfield;"

- Stating "[y]eah" to the question "Have you robbed any other banks in the past;"

- Stating "I guess, yeah, I'm gonna say yeah" when shown a surveillance photograph of the bank robber and being asked by law enforcement to confirm if that was him; and

- Stating "I said yes" when asked whether he had twice robbed a bank in Piscataway.

*See id.* at 4, 11, 13-14, 16-17, 21, 24, 27, 28, 35-36, 39 (annexed to Benvenuto Decl.).

During the course of the interview, law enforcement and Mr. Williams also discussed Mr. Williams' fear of a lengthy sentence, which Mr. Williams— *not* law enforcement—first raised.  *See id.* at 12.  After expressing his fear, Mr. Williams broached the possibility of striking a deal, asking law enforcement to "go back to the...prosecutor, can you get me something like 20, 30?"  *See id.* at 15.  In response to this request, law enforcement explicitly told Mr. Williams, "I cannot promise you a thing."  *See id.* at 15 (annexed to Benvenuto Decl.).

Law enforcement touched on this subject throughout the interview.  They discussed the possible range of outcomes for Mr. Williams, including (i) having active criminal cases in both the state and federal criminal systems, (ii) the possibility that Mr. Williams would receive consecutive versus concurrent sentences for the multiple bank robberies he committed, (iii) the possible number of charges Mr. Williams might face, and (iv) the fact that, if Mr.

26

Williams accepted responsibility and was cooperative with them, they would be able to inform the prosecutor of this fact. *See*, *e.g.*, *id.* at 12-14, 23, 30-31.

However, law enforcement was also explicit in warning Mr. Williams that they could not, and would not, promise him anything with respect to his ultimate sentencing exposure:

- "[t]he prosecutor can't...promise you a thing;"

- "I'd be breaking the law if I promised you and said okay listen we'll get you this and you know get you whatever...It's something we don't have the power...to do;"

- "I can't promise you anything and I told you that right from the get-go. I would be lying to you if I promised you;"

- "[W]e don't control everything, okay. We're just servants...;"

- "Again we don't have all power, we don't;"

- "Unfortunately I can't offer you anything more than that. Okay, there's no magic wand;"

- "There's no I have the power, you know, or Jeff doesn't have the power to say okay...[h]is bad okay and everything and...we'll let him go."

*See id* at 15, 31, 37-38.

On numerous occasions, law enforcement also gave Mr. Williams the option of ending the interview. For instance, they made the following statements:

- "I mean, fine if, if you don't want to talk anymore, we're good you know, we'll leave...;

27

- "Or, you know, we just, we end it here, we part as friends, you know, we're not...gonna...mother fuck you or anything like that;"

- "Ok, well then, you know what, then...maybe...our conversation is over;"

- "[I]f you want to revisit this issue we can, if you don't, that's fine;"

- "If you want to go back to this issue, we will.  If you don't want to that's fine.  Okay, we'll part as gentlemen like I said."

*See id.* at 13, 24, 35, 40-41 (annexed to Benvenuto Decl.).

At approximately 12:31 p.m., law enforcement told Mr. Williams that they would be concluding the interview to start the booking process.  *See id.* at 41 (annexed to Benvenuto Decl.).  At approximately 12:32 p.m., the interview was concluded and the audio recording was shut off.  Law enforcement then began the booking process, which was done in a separate room, and which entailed, among other things, obtaining basic pedigree information and fingerprinting Mr. Williams.

During the booking process, Mr. Williams continued to make statements about his role in the bank robberies that were not in response to questions by law enforcement.  Specifically, Mr. Williams stated in sum and substance that he wanted to accept responsibility for his actions so long as law enforcement understood that he had acted alone, and that his co-conspirators were not to blame (a claim that is false).  In response to Mr. Williams' repeated statements

28

that he wanted to accept responsibility for his criminal conduct, law enforcement asked Mr. Williams to look at the surveillance photographs obtained from the seven bank robberies.  Mr. Williams agreed to look at them, at which point he signed his name and wrote "me" on all of them.  *See* Exhibit N (annexed to Benvenuto Decl.).

29

## LEGAL ARGUMENT

### I.     ESTABLISHED THIRD CIRCUIT AND SUPREME COURT CASE LAW PERMITS THE GOVERNMENT TO OBTAIN HISTORICAL CELL-SITE RECORDS PURSUANT TO A 2703(d) ORDER

This Court should deny the defendant's motion to suppress because directly applicable Third Circuit case law, and the Supreme Court's third-party doctrine, permit the Government to obtain historical cell-site records pursuant to a 2703(d) order.  Indeed, the lone federal circuit court case cited by the defendant in support of his position was vacated on September 4, 2014, by a majority of the judges on the Eleventh Circuit, which has elected to rehear the case *en banc*.

In any event, as described in Section I.C. below, the Court can avoid this question altogether by finding that the search warrant affidavit used to obtain the defendant's historical cell-site records established probable cause without reliance on the lone cell-site record obtained pursuant to a 2703(d) order.[10]

---

[10] As a threshold matter, however, the Court should not entertain the defendant's suppression claims until he submits an affidavit averring that the Sprint cell-phone account in question (which was not subscribed to in his name) belonged to him, thereby showing that he had a reasonable expectation of privacy in it.  *See United States v. Serrano*, Crim. No. 13-58, 2014 WL 2696569, at *7 (S.D.N.Y. June 10, 2014) ("[T]o bring a claim for a violation of his Fourth Amendment rights, the defendant must put forward an affidavit or other evidence establishing that he has a cognizable privacy interest in the thing searched. . . . Accordingly, the defendant's motion to preclude or suppress the cell site data is denied on the basis that the defendant has not established the requisite standing to bring the motion.").

### A. Binding Third Circuit Case Law Permits the Government to Obtain Cell-Site Records Under 2703(d), Which is Consistent With Other Federal Circuit Courts

Since 2010, the U.S. Court of Appeals for the Third Circuit has permitted the Government to obtain historical cell-site records through a 2703(d) order. The Third Circuit has held that cell-site records "from cell phone calls [are] obtainable under a § 2703(d) order and that such an order does not require the traditional probable cause determination." *In re Matter of the Appl. of the U.S. for an Order Directing a Provider of Elec. Comm'n Serv. to Disclose Records to the Gov't*, 620 F.3d 304, 313 (3d Cir. 2010) (hereinafter, the "*Third Circuit Cell-Site Decision*").  This Court is bound by the Third Circuit's decision.  *Cf. United States v. Ordaz*, 398 F.3d 236, 240-41 (3d Cir. 2005) (explaining that a court is bound to follow the precedents of a higher court until that court overrules those precedents).

The *Third Circuit Cell-Site Decision* was an appeal from a federal magistrate judge's denial of the Government's application under section 2703 for a cell phone customer's cell-site records.[11]  The magistrate judge declined to issue a 2703(d) order because, in her view, a cell phone was a tracking device and "probable cause is the standard which the Government has long been required to obtain court approval for the installation and use" of a tracking device."  *Id.* at 308-09.  Additionally, the magistrate judge "proceeded from the

---

[11] The Third Circuit also described such records as "cell-site location information" or "CSLI."

31

premise that [cell-site records] can track a cell phone user to his or her location, leading the [magistrate judge] to conclude that [such records] could encroach upon what [she] believed were citizens' reasonable expectations of privacy regarding their physical movements and locations." *Id.* at 312.  The Third Circuit noted that the magistrate judge's "opinion was joined by the other magistrate judges in that district." *Id.* at 309.

The Third Circuit rejected that magistrate judge's decision, concluding that cell-site records are not the equivalent of a tracking device.  The court explained that cell-site records are not sufficiently precise to pinpoint a cell phone's location in "the interior of the home." *Id.* at 312-13.  The court held that historical cell-site records are "obtainable under a § 2703(d) order and that such an order does not require the traditional probable cause determination." *Id.* at 313.  According to the Third Circuit, the "standard is governed by the text of § 2703(d), i.e., 'specific and articulable facts showing that there are reasonable grounds to believe that . . . the records or other information sought, are relevant and material to an ongoing criminal investigation.'" *Id.* (quoting 18 U.S.C. § 2703(d)).  Finally, the Third Circuit noted that the magistrate judge "erred in allowing her impressions of the general expectation of privacy of citizens to transform [the 2703(d)] standard into anything else." *Id.*

The defendant acknowledges the *Third Circuit Cell-Site Decision*, but he seeks to distinguish it on several grounds.  First, the defendant notes that the 2703(d) application at issue in the *Third Circuit Cell-Site Decision* was for a

particular person's records from one particular cell phone provider, whereas the issue here is a "tower dump."  Even though he is well aware that the Government here obtained anonymized data—*without* any names, addresses, or other specific, personal identifying information—the defendant exaggerates the privacy implications of this anonymized information ("dragnet surveillance," "Orwellian," "145,000 uninvolved person," and so forth).  And, not only were the records that were obtained anonymized, the facts here show that the Government never even analyzed the records that it received until it had independently identified the defendant as a suspect and independently learned of the telephone number assigned to the Williams Cell Phone.

Further, to the extent that the defendant is challenging or relying upon the seizure of the anonymous transactional records relating to *other* individual cell phone customers, he plainly lacks standing to do so.  It is well established that, "[t]o invoke the Fourth Amendment's exclusionary rule, a defendant must demonstrate that his own Fourth Amendment rights were violated by the challenged search or seizure."  *United States v. Stern*, 597 F.3d 540, 551 (3d Cir. 2010).  Accordingly, the issue before the Court is whether the Government violated the *defendant*'s Fourth Amendment rights by obtaining *his* historical cell-site records through the use of a 2703(d) order.  And that is precisely the question that was answered in the negative in the *Third Circuit Cell-Site*

*Decision.*[12]

Second, the defendant attempts to distinguish the *Third Circuit Cell-Site Decision* because "the procedural posture was that of an investigation, rather than a motion to suppress."  Motion to Suppress Records & Data Obtained by a Cell Tower Dump Pursuant to Orders 12-6079 & 12-4035 (hereinafter, "Cell Tower Motion"), at 16.  But aside from pointing out *ipso facto* the different procedural posture of the case, the defendant does not explain *why* that difference should matter.  It does not.

Indeed, just as this Court has plenary power to review the legal issues raised by the defendant here, the Third Circuit had "de novo review" in the *Third Circuit Cell-Site Decision.  See* 620 F.3d at 305.  Moreover, even though "the Government's application was *ex parte* [and] there was no adverse party to review or oppose it," the opposition was well represented on appeal.  The court noted that it had "received amici briefs in support of affirmance of the District Court from a group led by the Electronic Frontier Foundation and joined by the American Civil Liberties Union, the ACLU-Foundation of Pennsylvania, Inc.,

---

[12] The Government notes that it generally resorts to using a "tower dump" in situations in which multiple crimes occur at different locations and law enforcement has not otherwise been able to develop any leads or suspects.  Thus, requiring probable cause for a "tower dump" will effectively eliminate this powerful investigative tool because law enforcement will almost never have probable cause if it is resorting to using a tower dump.  The Government thus respectfully submits that the privacy interest implicated in allowing law enforcement to obtain anonymized cell-tower transactional records under a 2703(d) standard is far outweighed by the practical effect of this powerful investigative tool, which allows law enforcement to determine which cell phones, if any, were in the vicinity of multiple crime scenes at or around the time that the crimes were committed.

and the Center for Democracy and Technology . . . and from Susan A. Freiwald, a law professor who teaches and writes in the area of cyberspace law and privacy law." *Id.,* at 306 n.1.

Third, the defendant also attempts to distinguish the *Third Circuit Cell-Site Decision* because it was decided before the Supreme Court's decision in *United States v. Jones*, 132 S. Ct. 945 (2012).  Yet the Supreme Court's decision in *Jones* was predicated on a trespass theory of the Fourth Amendment, *see United States v. Harrison*, 689 F.3d 301, 307 n.2 (3d Cir. 2013) (describing the *Jones* as embodying a "common law trespass" theory), and that trespass theory is plainly inapplicable here.[13]

Furthermore, even if the Third Circuit were inclined to reevaluate or change its holding in the *Third Circuit Cell-Site Decision*, the Government respectfully submits that such a decision must be made by the Third Circuit,

---

[13] The defendant also relies on the Supreme Court's recent decision in *Riley v. California*, 134 S. Ct. 2473 (2014), but that case is also inapposite to the issue here.  The search of a physical cell phone—in contrast to the acquisition of cell-site records kept by a cell phone provider—involves a physical intrusion that can reveal large amounts of *content*, including text messages, emails, and photographs.  Nor is *Riley*'s holding that law enforcement officers may not, without a warrant, physically search a phone's call log inconsistent with *Smith v. Maryland*, 442 U.S. 735 (1979) (holding that individuals have no reasonable expectation of privacy in dialed telephone numbers conveyed to the phone company).  Whereas *Smith* permitted the Government to obtain an individual's dialed telephone numbers from a phone company, no one would argue that *Smith* allows the Government to enter a house, without a warrant, to seize phone records contained therein.  Finally, while *Riley* may have been touted in the media as a watershed case, in terms of federal practice in the District of New Jersey, it will have little, if any, effect.  In this case, when the FBI seized the Williams Cell Phone, and cell phones belonging to other coconspirators, it obtained a search warrant authorizing their search.

not by this Court.  *Cf. Ordaz*, 398 F.3d at 240-41 (3d Cir. 2005) ("[T]he Supreme Court has made clear that if a [Supreme Court] precedent . . . has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.") (internal quotation marks and citations omitted).

Other federal circuit courts, including in a case decided after *Jones*, have agreed with the Third Circuit that cell-site records may be obtained under section 2703(d).  The Fifth Circuit, in a post-*Jones* case, held that "cell-site information is clearly a business record" and that section 2703(d) may be used to obtain historical cell-site records.  *See In re Appl. of U.S. for Historical Cell-Site Data*, 724 F.3d 600, 611, 615 (5th Cir. 2013).  Similarly, the Sixth Circuit has held that "DEA agents did not conduct a search within the meaning of the Fourth Amendment when they obtained Garner's cell-side data."  *United States v. Forest*, 355 F.3d 942, 951 (6th Cir. 2004), *vacated on other grounds*, 543 U.S. 1100 (2005) (vacating in light of *United States v. Booker*, 543 U.S. 220

(2005)).[14]

This Court should follow established Third Circuit precedent and deny the defendant's motion to suppress his cell-site records.

### B. There is No Reasonable Expectation of Privacy in Cell-Site Records Under the Supreme Court's Third-Party Doctrine

A historical cell-site record is a phone company's record of the cell tower and sector it used to handle a customer's call, just as a credit-card company keeps records of the business and location at which a customer has swiped his or her card or a bank keeps records of the ATM location at which a customer withdraws cash.  It is a business record generated and stored by a cell-phone

---

[14] The defendant is wrong in suggesting that the SCA or its legislative history did not contemplate cell-site records.  *See* Cell Tower Motion at 31.  In testifying in support of CALEA, then-FBI Director Louis J. Freeh told Congress that "[s]ome cellular carriers do acquire information relating to the general location of a cellular telephone. . . .  Even when such generalized location information, or any other type of 'transactional' information is obtained from communications service providers, court orders or subpoenas are required and obtained."  Statement of Luis J. Freeh, Director, FBI, Before the Senate Judiciary Subcomm. on Tech. and the Law and the House Subcomm. on Civil and Constitutional Rights, March 18, 1994, *available at* 1994 WL 223962.  CALEA subsequently forbade disclosure of cell-site records by a provider "solely pursuant" to the pen/trap statute, *see* 47 U.S.C. § 1002(2)(B); CALEA § 207, P.L. 103-313, 108 Stat. 4279, 4280-81 (1994), and it amended section 2703(d) to create the "articulable" facts standard.  Pursuant to the amended section 2703(d), in combination with the pen/trap statute, the SCA thus contemplates cell-site records and permits the Government to obtain such records.  *See, e.g.*, *In re Appl. of U.S. for an Order for Prospective Cell-Site Location Information on a Certain Cellular Telephone*, 460 F. Supp. 448, 461 (S.D.N.Y. 2006) ("Accordingly the Court accepts the government's argument that the Pen Register Statute and the Stored Communications Act, combined  pursuant to CALEA, permit a court to authorize the disclosure of prospective cell-site information, at least where, as here, the government does not seek triangulation information or location information other than that transmitted at the beginning and end of particular calls.").

company.  It is well established that a customer has no Fourth Amendment privacy interest in business records created and held by a third party.

Despite the lack of any Fourth Amendment interest in such records—and in contrast to credit card and ATM records obtained by subpoena without any *ante hoc* judicial oversight—the Government obtains cell-site records only through section 2703(d), which places a neutral magistrate and the "articulable" facts standard between the Government and such records.

Because a customer has no reasonable expectation of privacy in cell-site records, the defendant's motion to suppress should be denied.

### 1. A Customer Has No Reasonable Expectation of Privacy in Historical Cell-Site Records

In *United States v. Miller,* 425 U.S. 435 (1976), the Supreme Court rejected a Fourth Amendment challenge to a third-party subpoena for bank records and explained that the bank's records "are not respondent's 'private papers'" but are "the business records of the banks" in which a customer "can assert neither ownership nor possession."  *Miller*, 425 U.S. at 440.  The records "pertain to transactions to which the bank was itself a party."  *Id.* at 441.  In rejecting the challenge to the subpoena, the Court held "that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose

and the confidence placed in the third party will not be betrayed." *Miller*, 425 U.S. at 443.

The Third Circuit and other federal circuit courts have regularly applied this third-party doctrine in the electronic age. *See, e.g., United States v. Christie*, 624 F.3d 558, 573-74 (3d Cir. 2010) ("Federal courts have uniformly held that subscriber information provided to an internet provider is not protected by the Fourth Amendment's privacy expectation because it is voluntarily conveyed to third parties.") (collecting cases from the Fourth, Sixth, Ninth, and Tenth Circuits).

The reasoning of *Miller* also applies to historical cell-site records. First, cell-site records are not a customer's private papers. Once a customer places a call, she thereafter has no control over cell-site records relating to her phone. Although a customer is likely to be aware that the cell-phone company will assign a cell tower to handle her call, the customer typically does not know which cell tower is assigned to process her calls. Second, cell-site records are business records of the provider. The choice to create and store historical cell-site records is made by the provider, and the provider controls the format, content, and duration of the records it chooses to create and retain. *See United States v. Graham*, 846 F. Supp. 2d 384, 386 n.11 (D. Md. 2012) ("[E]ven courts that have concluded that government acquisition of cumulative cell site location records can violate the Fourth Amendment generally acknowledge that these records are generated in the ordinary course of the provider's business.")

39

(internal quotation marks and citation omitted); *see also* 47 C.F.R. § 42.6.[15]  In fact, because cell-site records are not in the possession of a customer, a customer could not be expected to produce cell-site records in response to a subpoena.  Third, cell-site records pertain to transactions to which the cell phone company was a party.  The assignment of a particular cell tower to process a call is made by the cell-phone company to facilitate the functioning of its network.  Thus, under *Miller*, a customer's historical cell-site records are not protected by the Fourth Amendment because they are the phone company's business records, rather than a customer's private papers.

The Supreme Court's reasoning in *Smith v. Maryland*, 442 U.S. 735 (1979), also demonstrates that a customer has no reasonable expectation of privacy in cell-site records.  In *Smith*, the telephone company installed a pen register at the request of the police to record numbers dialed from the defendant's telephone.  The Supreme Court held both that telephone users had no subjective expectation of privacy in dialed telephone numbers and also that any such expectation is not one that society is prepared to recognize as

---

[15] Even if cell phone companies were required to keep such records—and they are not—the Supreme Court's reasoning in *Miller* would nonetheless apply. "In *Miller*, the bank was required by the Bank Secrecy Act to keep the records at issue." *Graham*, 846 F. Supp. 2d at386 n.11 (explaining that "[b]ecause the records contained 'only information conveyed to the banks and exposed to their employees in the ordinary course of business,' the [Supreme] Court determined that the mandatory record keeping did not create a Fourth Amendment interest in those records 'where none existed before'" (citing *Miller*, 425 U.S. at 441-42)).

reasonable.  *See Smith*, 442 U.S. at 742-44.  The Court's reasoning in *Smith*
applies equally to cell-site records.

　　With respect to a customer's subjective expectation of privacy, the Court
in *Smith* stated, "[W]e doubt that people in general entertain any actual
expectation of privacy in the numbers they dial.  All telephone users realize
that they must 'convey' phone numbers to the telephone company, since it is
through telephone company switching equipment that their calls are
completed."  *Id.* at 742.  Similarly, cell-phone users understand that they must
send a signal that is received by a cell-phone company's antenna if the
company is going to route their call to its intended recipient.

　　As the defendant notes, the Third Circuit has cast doubt on the notion
that a "cell phone customer has . . . 'voluntarily' shared his location
information with a cellular provider in any meaningful way."  But anecdotal
evidence suggests otherwise.  *See* Orin Kerr, *Cell Phones, Magic Boxes, and the
Fourth Amendment*, The Volokh Conspiracy,
*http://www.volokh.com/2010/11/08/cell-phones-magic-boxes-and-the-fourth-
amendment/* (last visited Aug. 22, 2014) (noting that the "results of the reader
poll on how cell phones work were quite startling:  With over 1,600 votes cast,

the results indicated that 95% of those who answered the poll know that cell providers get location information").[16]

Cell-phone users will know from their experience with cell phones—and from the ubiquitous television and other advertisements paid for by large cell-phone providers touting their cell-tower "networks"—that cell phones communicate with a provider's cell towers and that these communications will convey information to the provider about their location.  Cell phone users routinely experience the frustration associated with dropped calls and recognize that calls are dropped when a phone's radio signal is having difficulty reaching a tower clearly.  And cell phones usually display bars representing the strength of the signal between the phone and tower.  Thus, cell-phone users understand that the provider will know the location of its own cell towers and that the provider will thus have some knowledge of the user's location.

In any event, the assumption that cell-phone users are not familiar with the technology is inconsistent with *Smith*.  In that case, the Supreme Court assumed that telephone users were familiar with telephone technology.  *See Smith*, 442 U.S. at 742 ("All telephone users realize that they must 'convey' phone numbers to the telephone company, since it is through telephone company switching equipment that their calls are completed.  All subscribers

---

[16] Kerr noted that, "the numbers were surprisingly lopsided," even taking into account that "Volokh Conspiracy readers aren't typical:  They have the intelligence and sophistication to visit here.  Plus, it makes sense that the poll would over-represent readers who know such things."

realize, moreover, that the phone company has facilities for making permanent records of the numbers they dial, for they see a list of their long-distance (toll) calls on their monthly bills."). As in *Smith*, when a court evaluates whether an expectation of privacy is objectively reasonable, this evaluation should be made based on a reasonable understanding of technology. Otherwise, rules based on ignorance will need to change as the public's understanding improves over time.

In *Smith*, the Supreme Court further held that even if the defendant had a subjective expectation of privacy in his dialed telephone numbers, "this expectation is not one that society is prepared to recognize as reasonable." *Id.* at 743 (internal quotation marks omitted). The Court explained that it "has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties," and it held that the user "voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business." *Id.* at 743-44. Here, a cell-phone user voluntarily transmits a signal to a cell tower for her call to be connected, and the provider thereby creates records, for its own business purposes, regarding which of its cell towers it used to complete the call. If anything, the privacy interest in cell-site records is even less than the privacy interest in a dialed phone number: the location of the cell phone tower handling a customer's call is generated internally by the phone company and is not typically known by the customer. A customer's Fourth Amendment rights

43

are not violated when the phone company reveals to the Government its own internal records that were never in the possession or control of the customer, especially when the phone company does so pursuant to an order issued by a neutral magistrate judge.

In fact, customers of Sprint agree to contractual terms of service and privacy policies, and these agreements demonstrate that customers voluntarily convey location information to their providers.  For example, Sprint's privacy policy states:

> To make wireless communications possible, wireless networks use the location of your device to deliver mobile services whenever your device is turned on.

*See* Sprint, Customer Privacy FAQs, *available at http://newsroom.sprint.com/consumer-resources/customer-privacy-faqs.htm#How is my device location info used* (last visited Sept. 2, 2014). Sprint also tells customers that it collects "Mobile Usage Information" from customers, including what it describes as "[h]igh-level location information (e.g., location of the cell tower serving your device)."  *Id.*

By analogy, while courts have extended Fourth Amendment protection to the *contents* of safety deposit boxes and emails, similar protection has *not* been accorded to records—created by the post office or email provider—detailing how often, for example, the safety-deposit box or email account has been used.  *See, e.g., United States v. Thomas*, 878 F.2d 383, *3 (6th Cir. 1989) (per curiam) ("We recognize that Thomas is correct in claiming that citizens have legitimate

44

expectations of privacy in the contents of their safe deposit boxes.  However,

Thomas' first point involves examination of bank records revealing Thomas to

be the owner of the deposit boxes, not the search of the boxes themselves.");

*United States v. Conn. Bank & Trust Co.*, Civ. No. 79-112, 1979 WL 1520, at *2-

3 (D. Conn. Aug. 9, 1979) (rejecting the claim made by the subject of an IRS tax

investigation that the Fourth Amendment protected the "entry card of his safe

deposit box" and the "records kept concerning its use"); *see also United States*

*v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2007) ("[E]-mail and Internet users

have no expectation of privacy in the to/from addresses of their messages or

the IP addresses of the websites they visit because they should know that this

information is provided to and used by Internet service providers for the

specific purpose of directing the routing of information.").  These cases

highlight the distinction between private records (given to a third-party as a

bailee), and records either voluntarily divulged to, or created by the, third-party

business.  Under *Miller* and *Smith*, the latter do not receive Fourth Amendment

protection.

### 2. Compulsory Process Is Subject to a Reasonableness Standard, Not a Warrant Standard

The compelled disclosure of historical cell-site records in this case is

supported not only by *Miller* and *Smith v. Maryland*, but also by the more

general law applicable to subpoenas.  A 2703(d) order functions as a judicial

subpoena.  It compels the recipient to produce specified information; the

recipient may move to quash; and it remains at all times under the supervision of the issuing court. *See* 18 U.S.C. § 2703(d). Thus, cases addressing the Fourth Amendment principles applicable to subpoenas also apply to 2703(d) orders. Under these cases, no warrant or showing of probable cause is required to use a subpoena to compel disclosure of non-privileged evidence relevant to a criminal investigation.

There has never been a warrant requirement to use compulsory process to obtain evidence from a witness, and here the phone company functions as a witness. Often, "the very purpose of requesting the information is to ascertain whether probable cause exists." *United States v. R. Enterprises*, 498 U.S. 292, 297 (1991). Instead, the Supreme Court has long held that for compulsory process is subject only to a Fourth Amendment reasonableness requirement. *See, e.g.*, *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 208 (1946). Here, a court issued 2703(d) orders for the defendant's cell-site records based on a judicial finding that the records were relevant and material to an ongoing criminal investigation. These orders satisfy the Fourth Amendment's reasonableness standard.

The Supreme Court has held that the Government's interest in compelling disclosure of every person's non-privileged evidence is "both fundamental and comprehensive," as it is closely linked to "the twofold aim" of the criminal justice system "that guilt shall not escape or innocence suffer." *United States v. Nixon*, 418 U.S. 683, 709 (1974); *see also In re Subpoena Duces*

46

*Tecum*, 228 F.3d 341, 346 (4th Cir. 2000) ("[T]he authority to command persons to appear and testify or to produce documents or things . . . is a longstanding and necessary adjunct to the governmental power of investigation and inquisition."). In particular, the Government's ability to obtain relevant evidence from witnesses, businesses or otherwise, is critical to the truth-seeking function of the criminal justice process. "The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts." *Id.* Thus, "[t]o ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence." *Id.* This Court should decline the defendant's invitation to impose a warrant requirement for compelled disclosure of cell-site records.

### 3. The Eleventh Circuit's Decision—Which Has Been Vacated—Is Contrary to Long-Established Supreme Court Precedent

This Court should reject the defendant's invitation to ignore settled Third Circuit and Supreme Court precedent in favor of the Eleventh Circuit's recent decision in *United States v. Davis*, 754 F.3d 1205 (11th Cir. 2014)—a decision that has been vacated, *see United States v. Davis*, --- Fed. App'x --- (11th Cir. Sept. 4, 2014). In *Davis*, a panel of the Eleventh Circuit held—categorically—that cell-site records are "within the subscriber's reasonable expectation of privacy" and that the "obtaining of that data without a warrant is a Fourth Amendment violation." *Id.* at 1217. Not only is the *Davis* decision inconsistent

47

with decisions of the Supreme Court and the Third, Fifth, and Sixth Circuits, but the Solicitor General of the United States authorized the U.S. Attorney's Office for the Southern District of Florida to file a petition seeking rehearing en banc.  *See* Exhibit I (*United States v. Davis*, Gov't Pet. for Reh'g (11th Cir. Aug. 2, 2014)) (annexed to Benvenuto Decl.).  On September 4, 2014, a majority of the judges of the Eleventh Circuit voted to rehear the *Davis* case *en banc*, and the court vacated the panel's decision.

The *Davis* panel, while acknowledging that the Supreme Court's decision in *Jones* was distinguishable because it had been decided on a trespass theory, concluded that *Jones* was "the most relevant Supreme Court precedent."  *Id.* at 1211.  Based on the concurring opinions filed in *Jones*, the panel reasoned that "the privacy theory [of the Fourth Amendment] is not only alive and well, but available to govern electronic information of search and seizure in the absence of trespass."  *Id.* at 1215.

Applying this "privacy theory," the court concluded that the acquisition of cell-site records with a 2703(d) order "violated [Davis's] reasonable expectation of privacy."  *Id.*  The court explained that "[t]here is a reasonable privacy interest in being near the home of a lover, or a dispensary of medication, or a place of worship, or a house of ill repute."  *Id.*

But the panel's reasoning lacks both legal and factual support.  As a legal matter, the panel's decision unmoors the Fourth Amendment from its text ("The right of the people to be secure in *their* persons, houses, papers, and

48

effects against unreasonable searches and seizures").  Without this textual tether, the general privacy standard created by *Davis* is simply ungovernable. The panel's decision extends Fourth Amendment protection to "private facts" about a person without reference to how, or from whom, the information is obtained.[17]  Thus, the panel accords Fourth Amendment protection to cell-site records because such records (the panel wrongly assumed) can reveal whether someone visited "a gynecologist, a psychiatrist," a "dispensary of medication," or the "home of a lover."  Yet extending the Fourth Amendment to the realm of "private facts" is incongruous with long-standing Fourth Amendment doctrine. Credit-card records, hotel and restaurant receipts, and E-Z pass toll records can reveal—often with *far more* accuracy than cell-site-records—whether someone visited "a gynecologist, a psychiatrist," a "dispensary of medication," or innumerable other "private" facts.  Yet those records, which like cell-site records are created by, and are in the custody of, a third-party business, receive *no* Fourth Amendment protection whatsoever.  In fact, such records are obtainable by grand jury subpoena, without the *ante hoc* protections of a

---

[17] *See, e.g.,* Orin Kerr, Eleventh Circuit, Disagreement with the Fifth, Holds Fourth Amendment Protects Cell-Site Records, *available at* http://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/06/11/eleventh-circuit-disagreeing-with-the-fifth-holds-fourth-amendment-protects-cell-site-records/ (last visited Aug. 24, 2014) ("The Fourth Amendment does not declare certain facts to be inherently protected by the Fourth Amendment regardless of how they are obtained. What matters is how the government learns those facts, not the facts themselves.  For example, let's say a cop stands on a public street in front of a church and watches people enter and exit. From that, the cop learns not only who is near the church but who has entered and exited it. Traditionally this has not thought to be a search.").

neutral magistrate and the "articulable" facts standard afforded by section 2703(d).

Ultimately, the Third Circuit in the *Third Circuit Cell-Site Decision* seemed to reject the general privacy theory created by the *Davis* panel. It concluded that the magistrate judge there had "erred in allowing her impressions of the general expectation of privacy of citizens to transform [the 2703(d)] standard into anything else." 620 F.3d at 313.

The panel's decision also contradicts the Supreme Court's third-party doctrine as set forth in *Miller* and *Smith*. The panel speculated that most customers are unlikely to be aware that their cell phone providers collect and store historical location information. But for the reasons set forth above, that assumption is not necessarily justified as an empirical matter, and it contradicts the Supreme Court's reasoning in *Smith*, which assumed that customers know of undisputed and readily ascertainable facts about technology. Moreover, the panel's decision is directly inconsistent with the Third Circuit's decision in the *Third Circuit Cell-Site Decision*, which accorded no Fourth Amendment protection to historical cell-site records.

Even if the panel's expansive legal theory were legally sound—and it is not—the decision is also wrong as a factual matter. Rarely, if ever, are cell-site records sufficiently precise to distinguish whether a cell phone is within one particular residence or business. The Third Circuit recognized as much in the *Third Circuit Cell-Site Decision*, 620 F.3d at 312-13 ("There is no evidence in

50

this record that historical [cell-site records], . . . extend[] to that realm [i.e., the interior of the home].").  Hence, cell-site records would be of no use in determining whether someone is at the "home of a lover" or a "place of worship."  At most, even in dense geographical locations like Newark with many cell towers, cell-site records would reveal the particular neighborhood or a collection of numerous blocks where the particular cell phone is located. This is in contrast to GPS or E-911 data, which generally speaking can provide much more accurate location data.  As the Government's petition for rehearing en banc in *Davis* argues, "[T]he vicinity information revealed [by cell-site records] is useful only if one already has a point of reference—in this case, for example, the robbery locations—[because] the records themselves do not provide a basis for ascertaining that point of reference."  Exhibit I at 15 (*United States v. Davis*, Gov't Pet. for Reh'g (11th Cir. Aug. 2, 2014)).

For these reasons, this Court should follow established Supreme Court and Third Circuit precedent and hold that the Government's acquisition of Mr. Williams' historical cell-site records pursuant to section 2703(d) did not violate the Fourth Amendment.

### C. The Court Need Not Decide Whether the Fourth Amendment Prohibits the Government From Obtaining Cell-Site Records Because the Search Warrant—Independent of the Cell-Tower Records—Established Probable Cause

Under the independent-source doctrine, this Court need not decide whether the Fourth Amendment prohibits the Government from obtaining cell-

51

site records pursuant to a 2703(d) order.  The defendant here moves to suppress the historical cell-site records that the Government obtained pursuant to a Rule 41 search warrant on the ground that the affidavit submitted in support of the warrant included one paragraph referencing data obtained pursuant to the cell-tower dump (which was obtained with a 2703(d) order).[18]  If the Court suppresses the cell-tower dump, the defendant argues, then the Rule 41 search warrant is defective as a fruit of the poisonous tree.

Yet, even if this paragraph is stripped from the search warrant affidavit, the affidavit still establishes probable cause to believe that the requested records would lead to evidence of a crime and a person to be arrested.  The Third Circuit has held that the "independent source doctrine serves as an exception to the exclusionary rule and permits the introduction of evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegal activity."  *United States v. Stabile*, 633 F.3d 219, 243 (3d Cir. 2011) (quoting *United States v. Price*, 558 F.3d 270, 281 (3d Cir. 2009)).  Pursuant to that doctrine, "evidence that was *in fact* discovered lawfully, and not as a direct or indirect result of illegal activity, is admissible."  *United States v. Herrold*, 962

---

[18] Specifically, paragraph 19 of Exhibit G (Affidavit, Mag. No. 12-3679) stated:  "Based on cell site information obtained by law enforcement pursuant to an Order issued on June 5, 2012, by the Honorable Michael A. Shipp, United States Magistrate Judge, the [Williams Cell Phone] connected to a cellular telephone tower near the Somerset Savings Bank shortly before it was robbed on November 21, 2011."

F.2d 1131, 1140 (3d Cir. 1992).  To determine if the doctrine applies, this Court must determine:  "(1) whether a neutral justice would have issued the search warrant even if not presented with information that had been obtained during an unlawful search and (2) whether the first search prompted the officers to obtain the search warrant."  *Id.*  "If the answers to these questions are yes and no, respectively, . . . then the evidence seized during the warranted search, even if already discovered in the original entry, is admissible."  *Id.*; *see Murray v. United States*, 487 U.S. 533, 537, 541 (1988).

The first question looks to whether a neutral magistrate would have found probable cause to authorize the search had the search warrant affidavit not contained evidence learned during the unlawful search.  The second question asks whether the unlawful search—as opposed to other evidence known by the officers—prompted them to later seek the search warrant.  *Price*, 558 F.3d at 282 (affirming denial of suppression based on the independent-source doctrine); *see Stabile*, 633 F.3d at 245 (given evidence known by officers, "it would be 'impossible' or 'inconceivable'" that a warrant would not have been sought); *Herrold*, 962 F.2d at 1140 (same).

Here, the answer to the first question is "yes," because the search warrant affidavit established probable cause even without the information obtained from the cell tower dump.  The affidavit set forth facts establishing reasonable grounds to believe that the perpetrator for each of the seven robberies was the same.  Exhibit G ¶¶ 6-12 (Affidavit, Mag. No. 12-3679).  It

53

further established that an off-duty police officer had observed the perpetrator fleeing from the July 12 bank robbery and get into a green Ford Taurus. *Id.* ¶ 13-15. Based on witness interviews, law enforcement determined that Mr. Williams was the actual owner of that green Ford Taurus and that he used the Williams Cell Phone. *Id.* ¶ 17. Finally, law enforcement determined that Mr. Williams had features (a shaved head and facial hair) consistent with the off-duty police officer's observations. *Id.* ¶¶ 16, 18. Given that more than one individual was involved in most of the bank robberies, law enforcement had probable cause to believe that the historical cell-site records corresponding to the Williams Cell Phone would assist law enforcement in finding evidence of a crime and helping to locate and conduct surveillance on the defendant. *Id.* ¶ 20.

The answer to the second question is "no," because the tower dump records *did not in any way* prompt the officers to seek the subsequent search warrant. In fact, the tower dump records were not even analyzed until after the FBI had already independently identified Claude Williams as a subject. The search warrant was sought as a result of the off-duty police officer identifying the green Ford Taurus that the FBI subsequently linked to the defendant.

Thus, the independent-source doctrine applies. And consequently, this Court need not rule on the constitutional questions raised by the defendant (even though there is binding Third Circuit case law resolving the issue in the Government's favor).

## II.   THE GOVERNMENT LAWFULLY OBTAINED REAL-TIME CELL-SITE RECORDS PURSUANT TO A 2703(d) ORDER AND, JUST A FEW DAYS LATER, PURSUANT TO A SEARCH WARRANT

In addition to moving to suppress historical cell-site records, the defendant moves to suppress the Government's acquisition of real-time cell-site records.  *See* Motion to Suppress Prospective Cell-Site Location Information (hereinafter, "Real-Time Cell-Site Records Motion").

The Government obtained real-time cell-site records pursuant to a 2703(d) order for a period of less than two days, from July 13, 2012, through July 14, 2012.  On the evening of July 12, 2012, the Government applied, under the hybrid authority of both 18 U.S.C. §§ 2703(d) and 3122, to obtain real-time cell-site records, but *not* GPS, E-911, or other precise location information, for the Williams Cell Phone.  *See* Exhibit C (Appl., Mag. No. 12-3678); Exhibit D (Order, Mag. No. 12-3678).

Just two days later, however, on July 15, 2012, the Government obtained a Rule 41 search warrant, based on probable cause, from Judge Falk authorizing it to obtain real-time location information, including real-time cell-site records *and* GPS, E-911, and other precise location data.  *See* Exhibit G (Affidavit, Mag. No. 12-3679); Exhibit H (Search Warrant, Mag. No. 12-3679).  Pursuant to this search warrant, the Government obtained real-time cell-site records from July 15, 2012, through July 31, 2012, the day that Claude Williams was arrested.

In his motion, the defendant appears to be requesting suppression of the records obtained between July 13, 2012, and July 14, 2012, on the ground that such records were obtained under a 2703(d) order, rather than a Rule 41 search warrant.  In addition, the defendant is seeking suppression of the records obtained by way of a Rule 41 search warrant between July 15, 2012, and July 31, 2012, on the ground that probable cause was lacking to support issuance of the Rule 41 warrant.  The defendant's first argument is moot, and both arguments are without merit.

### A.  The Motion to Suppress Real-Time Cell-Site Records Obtained by 2703(d) Order Is Moot and Has No Merit

As an initial matter, the real-time cell-site records that the Government obtained through a 2703(d) order between July 13, 2012, and July 14, 2012, do not, at this point, have any evidentiary value.  The Government does not anticipate introducing these records at trial, nor does it anticipate introducing other evidence acquired derivatively from this information.  Accordingly, the defendant's motion is moot, and the Court need not decide this issue.

In any event, the Third Circuit in the *Third Circuit Cell-Site Decision* "acknowledge[ed] that numerous magistrate judges and district courts in other jurisdictions have addressed various issues regarding whether the Government can obtain prospective [cell-site records] through the authorization found in § 2703(d) alone or in combination with the pen register and trap and trace statutes (the 'hybrid' theory)."  620 F.3d at 3010 n.6; *see also In re Appl. of U.S.*

*for an Order for Prospective Cell-Site Location Information on a Certain Cellular Telephone*, 460 F. Supp. 448, 461 (S.D.N.Y. 2006) ("Accordingly the Court accepts the government's argument that the Pen Register Statute and the Stored Communications Act, combined  pursuant to CALEA, permit a court to authorize the disclosure of prospective cell-site information, at least where, as here, the government does not seek triangulation information or location information other than that transmitted at the beginning and end of particular calls."); *In re Appl. of U.S. for an Order for Disclosure of Telecommunications Records and Authorizing the Use of a Pen Register and Trap and Trace*, 405 F. Supp. 2d 435, 450 (S.D.N.Y. 2005) (same).[19]

In fact, under current standard practice in the District of New Jersey, federal magistrate judges routinely authorize the Government to obtain real-time cell-site records under the hybrid authority of both 18 U.S.C. §§ 2703(d) and 3122.  (In contrast, the current standard practice in the District of New Jersey for obtaining more precise GPS or E-911 location information is to use a Rule 41 search warrant.)

Indeed, if the Government can obtain historical cell-site records, under 2703(d)'s "articulable facts" standard, on the ground a cell phone customer does not have a reasonable expectation of privacy in records that are

---

[19] Several courts have also held that real-time cell-site records cannot be obtained through the combined authority of a 2703(d) order and the pen/trap statute.  *See, e.g.*, *Third Circuit Cell-site Decision*, 620 F.3d at 3010 n.6 (collecting cases).

voluntarily conveyed to a business, there is no justification for treating the real-time acquisition of such records any differently.[20]

### B. The Affidavit Submitted in Support of the Rule 41 Search Warrant Established Probable Cause to Obtain Real-Time Cell-Site Records

The search warrant that the Government obtained on July 15, 2012, was supported by ample probable cause to believe that (1) Mr. Williams had committed and would continue to commit crimes, namely bank robberies, (2) that Mr. Williams had used and would continue to use the Williams Cell Phone in furtherance, and to facilitate the commission, of bank robberies, and (3) that the real-time cell-site records would assist in locating "evidence of a crime," "contraband, fruits of crime, or other items illegally possessed," and "a person to be arrested."  *See* Rule 41(c) (listing the grounds for which a "warrant may be issued").

The principles governing probable cause are well established.  Probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 236 (1983).  The Third Circuit has explained that "[t]he supporting affidavit to a search warrant is to be read in its entirety and in a common sense,

---

[20] The defendant is wrong when he asserts that "the Government's use of a Rule 41 warrant is a concession that such information can only be acquired when probable cause exists."  The Third Circuit itself in the *Third Circuit Cell-site Decision* held that the SCA permitted cell-site records to be obtained either through a 2703(d) order *or* a probable cause search warrant.

nontechnical manner." *United States v. Miknevich*, 638 F.3d 178, 182 (3d Cir. 2011). This Court does "not undertake a de novo review of whether probable cause actually existed." *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993) ("When faced with a challenge to a magistrate's probable cause determination, a reviewing court must remember that its role is limited."). A reviewing court's "role is limited to ensuring that a magistrate had a 'substantial basis' for concluding that the affidavit supporting the warrant established probable cause." *Miknevich*, 638 F.3d at 182.

The search warrant affidavit, which is attached as Exhibit G (Affidavit, Mag. No. 12-3679), described the manner in which six of the bank robberies had been committed and the numerous reasons that law enforcement believed that the same perpetrator had committed each of the six robberies. Exhibit G, ¶¶ 6-12 (Affidavit, Mag. No. 12-3679). The affidavit then described how, in five of the six bank robberies, another individual (both female and male coconspirators) had gone into the bank shortly before the robbery in order to "case" it. *Id.* The affidavit further described how, after the July 12, 2012, robbery, the off-duty police officer observed the perpetrator get into the back seat of a green Ford Taurus being driven by a female coconspirator. *Id.* ¶¶ 14-15. The affidavit explained that, after speaking with a witness, the FBI obtained the telephone number to the Williams Cell Phone. *Id.* ¶ 17.

Finally, the affiant—an FBI agent with over 15-years' experience who had investigated over 100 bank robberies, *see id.* ¶ 3—explained that, "[b]ecause

there is more than one individual involved in the bank robberies under investigation, there is a high probability that these individuals utilized cellular telephones in furtherance of their criminal activities, and/or to report to other persons the fruits of their criminal activity." *Id.* ¶ 20.  The affiant also explained that "[b]ased upon [his] knowledge, training, and experience, and that of other law enforcement officers with whom [the affiant had] spoken, individuals involved in bank robberies often keep the proceeds from, and tools of, their offense at their home." *Id.* ¶ 33.

Based on these facts, and as Judge Falk ultimately determined, law enforcement had ample probable cause to believe that Mr. Williams had committed, and would likely continue to commit, federal crimes, that he had used his phone in furtherance of those crimes, and that his location was relevant because the FBI needed to surveil him to prevent further crimes and because they had probable cause to arrest him for his involvement in the bank robberies.  The facts set forth in the affidavit therefore belie the defendant's claim that the "warrant fails to establish any meaningful connection between the use of Mr. Williams' phone and his alleged criminality."  Real-Time Cell-Site Records Motion at 11.  Because there was probable cause to believe that Mr. Williams had engaged in a bank robbery spree and would continue to commit bank robberies (as he indeed attempted to do), the affidavit established the required nexus—that records and information about the defendant's general location would uncover evidence of further crimes (as it indeed did).

60

The defendant further contends that the Government did not establish a connection between the criminal activity and his home.  That argument assumes, however, that the real-time cell-site records could track the defendant precisely to home.  As discussed earlier, in the overwhelming majority of cases, cell-site records, whether historical or real-time, are not capable of tracking a phone to a specific building or residence, and the real-time cell-site records that were obtained in this case did *not* permit the FBI to do so.[21]  In any event, the search warrant affidavit established probable cause to allow the FBI to track the defendant to his home; the warrant explained that, based on the affiant's knowledge training and experience and on the fact that the defendant had committed seven previous bank robberies over the course of ten months, there was probable cause to believe that the defendant would "keep the proceeds from, and the tools of, [his] offense at [his] home."  Exhibit G (Affidavit, Mag. No. 12-3679).

Accordingly, this Court should deny the defendant's motion to suppress real-time cell-site records obtained in this case through a 2703(d) order and, two days later, through a Rule 41 probable cause warrant.

---

[21] Thus, the *United States v. Powell* case, upon which the defendant relies, is distinguishable in numerous respects.  First, in *Powell*, authorities received real-time cell-site records for a period of 45 days, far longer than the 15 days for which real-time cell-site records were obtained here.  *Powell*, 943 F. Supp. 2d 759, 783 (E.D. Mich. 2013).  Second, the court in *Powell* assumed that the real-time cell-site records would have permitted authorities to track Powell's "location in protected areas, like his residence."  Again, the cell-site records obtained here did not permit FBI agents to track Mr. Williams into or within his residence.

### III.   THE GOVERNMENT USED THE MOBILE EQUIPMENT PURSUANT TO A VALID RULE 41 SEARCH WARRANT

#### A.  The Search Warrant Affidavit More Than Adequately Described the Capabilities of the Mobile Equipment

The defendant accuses the Government of failing to "provide Magistrate Falk with essential information about the nature and scope of the search" using the Mobile Equipment.  *See* Motion to Suppress Cell-Site Location Information Seized by a Stingray/Cell-site Simulator (hereinafter, the "Mobile Equipment Motion") at 15.  The defendant claims:  "The Affidavit did not explain that the device broadcasts signals to all devices in the area, receives information about other devices in the possession of third parties, potentially disrupts the connections of third-party devices, and penetrates the walls of every private residence in the vicinity, not solely that of the target."  Mobile Equipment Motion at 16.

This allegation is thoroughly belied simply by reference to the search warrant affidavit.  It ***explicitly*** advised the Court as follows:

> Because of the way the Mobile Equipment sometimes operates, its use has the potential to intermittently *disrupt cellular service* to a small fraction of Sprint's wireless customers within its immediate vicinity.  Any potential service disruption will be brief and minimized by reasonably limiting the scope and duration of the use of the Mobile Equipment.

> In order to achieve the investigative objective (i.e., determining the general location of the Target Facility) in a manner that is the least intrusive, *data incidentally acquired from phones other than the [Williams Cell Phone]* shall not be recorded and/or

62

> retained beyond its use to identify or locate the
> [Williams Cell Phone].

Exhibit G, ¶¶ 27-28 (Affidavit, Mag. No. 12-3679) (emphasis supplied).

The search warrant affidavit further told Judge Falk that the Mobile Equipment was "capable of receiving, sending, and capturing the dialing, routing, addressing and signaling information that cellular telephones such as the [Williams Cell Phone] use."  Exhibit G, ¶ 24 (Affidavit, Mag. No. 12-3679). While perhaps the affidavit did not expressly state that the "signaling information" that the Mobile Equipment was capable of "receiving" and "sending" could, as the defendant puts it, "penetrate walls," a common sense reading of the stated capabilities of the Mobile Equipment makes that implicit.

Similarly without merit is the defendant's claim that the affidavit "provides only minimal explanation of the capabilities" of the Mobile Equipment.  Mobile Equipment Motion at 15.  The affidavit provided a thorough explanation of the manner in which the device would operate.  The affidavit explained that the device operated by "mimicking one of Sprint's cell towers to get the [Williams Cell Phone] to connect to it."  Exhibit G, ¶ 24 (Affidavit, Mag. No. 12-3679).  It further explained that the Mobile Equipment "may simply screen signaling information going to or from Sprint's cell towers in the Mobile Equipment's immediate vicinity for dialing, routing, or addressing information emanating from or destined to the [Williams Cell Phone]."  *Id.* Once the Mobile Equipment had done this, the affidavit continued, "it may

63

display one or more of the paths from which the [Williams Cell Phone]'s signals are received and the strength of those signals."  *Id.*  Finally, the affidavit explained that "the operation of the Mobile Equipment, in turn, may determine the location from which the [Williams Cell Phone] is most likely emitting signals."  *Id.*

Given this thorough explanation, it is difficult to conceive how the defendant can argue that the "Government misled Judge Falk into believing that the [Mobile Equipment] was a form of PRTT, a technology that has long been in use which allows investigators to merely ascertain what phone numbers are dialed, and the numbers of incoming calls."  Mobile Equipment Motion at 17.  Here, the Government expressly told Judge Falk that the Mobile Equipment was capable of detecting signals from the Williams Cell Phone and "the strength of those signals" and that the device was capable of "determin[ing] the location" of the Williams Cell Phone.  Exhibit G, ¶ 24 (Affidavit, Mag. No. 12-3679).

At bottom, the defendant's main concern appears to be semantics—that the Government described the device as a "mobile pen register device" or as the "Mobile Equipment," rather than by any proprietary name it might have.  This Court should reject the far-fetched notion that "had Judge Falk read" a proprietary name for the device "he may have denied the application."

Because the Government advised Judge Falk of the way in which the Mobile Equipment worked and the manner in which the FBI intended to use it,

64

this Court should reject the defendant's motion to suppress on this basis.

Moreover, although the Government here described in great detail the way the Mobile Equipment worked, the warrant would not have been invalid even if the Government had not done so.  In *Dalia v. United States*, 441 U.S. 238, 257 (1979), the Supreme Court rejected the claim that a warrant must precisely describe the manner of its execution.  In *Dalia*, the Government obtained a wiretap order to intercept the defendant's oral conversations in his law office.  *Id.* at 242.  To execute the order, FBI agents broke into his office at midnight and spent three hours installing a listening device; approximately 40 days later they entered again to remove the device.  *Id.* at 245.  At trial, Dalia challenged the Government's use of the intercepted communications because the wiretap order itself had not authorized the covert entry.  *Id.*  The district court rejected this argument, and the Supreme Court agreed:  "Nothing in the language of the Constitution or in this Court's decisions interpreting that language suggests that, in addition to the three requirements discussed above, search warrants also must include a specification of the precise manner in which they are to be executed.  On the contrary, it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant—subject of course to the general Fourth Amendment protection 'against unreasonable searches and seizures.'"  *Id.* at 257.

Based on *Dalia*, the district court in *United States v. Rigmaiden*, 2013 WL

1932800 (D. Ariz. May 8, 2013), rejected the same argument now made by the defendant here. The court held that "[a]lthough the [cell-site simulator] warrant did not describe the precise means by which the mobile tracking device would operate, what signals it would send to the aircard, what signals it would capture, or the fact that it would cause some of Defendant's electricity to be consumed in the process, these and the many other details of the device's operation described in Defendant's motion clearly concern the manner in which the search was to be executed, something that need not be stated with particularity in the warrant." *Id.* at *17. Because the warrant here satisfies the Particularity Clause, this Court should reject the defendant's motion to suppress.

### B. No Basis Exists for a *Franks* Hearing

In *Franks v. Delaware*, the Supreme Court held that "where the defendant proves by a preponderance of the evidence 'that a false statement knowingly and intentionally, or with reckless disregard for truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that . . . the fruits of the search [must] be excluded to the same extent as if probable cause was lacking on the face of the affidavit.'" *United States v. Frost*, 999 F.2d 737, 742-43 (3d Cir. 1993) (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)). Thus, suppression is required if a defendant makes a "*substantial preliminary*" showing that: (1) the affidavit contains a material

66

misrepresentation, (2) the affiant made the misrepresentation knowingly and intentionally, or with reckless disregard for the truth, and (3) the allegedly false statement was material to the finding of probable cause. *United States v. Brown*, 3 F.3d 673, 677-78 (3d Cir. 1993) (emphasis supplied); *Frost*, 999 F.2d at 742-43.

When examining an allegedly "false affidavit used to obtain a search warrant, [a court] must remove a falsehood created by an omission by supplying the omitted information to the original affidavit." *Sherwood v. Mulvihill*, 113 F.3d 396, 400 (3d Cir. 1997). The Third Circuit has explained that the inquiry in such a case is whether "the warrant would have properly been issued if the omitted information had been supplied." *United States v. Calisto*, 838 F.2d 711, 716 (3d Cir. 1988); *see also Franks*, 438 U.S. at 171-72 (noting that a hearing is not required "if, when material that is the subject of the allegedly falsity or reckless disregard is set to one side, there remains sufficient content in the warrant to support a finding of probable cause").

### 1. The Search Warrant Affidavit Does Not Contain Any Material Omissions Related to Prior Applications or Orders

The defendant claims that the Government's failure to inform Judge Falk of Judge Shwartz's prior order, and her amendments to the Government's proposed order, constitutes a material omission under *Franks*. Because Judge Shwartz's limitation on the Government's use of the Mobile Equipment on the basis of a 2703(d) standard was immaterial to Judge Falk's decision whether

the Government had met the higher legal standard of probable cause, this Court should reject the defendant's request for a *Frank*'s hearing.

On Friday, July 13, 2012, the Government submitted an application to Judge Falk's chambers for permission to use the Mobile Equipment. Although it was Judge Falk's week as the duty magistrate, Judge Falk's chambers directed the Government's application to Judge Shwartz, who was covering for Judge Falk that day.[22] The Government's request to use the Mobile Equipment was made in the form of a 2703(d) application under the hybrid authority of both 18 U.S.C. §§ 2703(d) and 3122, as was standard practice in the District of New Jersey at that time. *See* Exhibit E (Appl., Mag. No. 12-3092).

Because the Government's request was not made in the form of a Rule 41 search warrant, which requires a finding of probable cause, Judge Shwartz limited the Government's ability to use the Mobile Equipment. Specifically, although Judge Shwartz authorized the FBI to use the equipment, she ordered that "in no event [shall the FBI] use the mobile equipment, *absent other authority*, to locate the [Williams Cell Phone] in any private place or where they have reason to believe that the [Williams Cell Phone] is in a private place."[23]

---

[22] The undersigned Assistant U.S. Attorney can produce to the Court, if needed, the emails, dated Friday, July 13, showing that the Government submitted the application to Judge Falk, whose chambers then directed the application to Judge Shwartz.

[23] Prior to Judge Shwartz's handwritten change, the proposed order would have permitted the FBI to use the device but "in no event [shall the FBI] use the Mobile Equipment, absent other authority, to locate the [Williams Cell Phone] once

*See* Exhibit F, pgs. 4-5 (Order, Mag. No. 12-3092) (emphasis supplied).

That same evening, the Government advised Judge Shwartz that it would be applying for a search warrant, under Rule 41's probable cause standard, allowing the FBI to use the Mobile Equipment to track the Williams Cell Phone to a private residence or location.  Judge Shwartz indicated that the Government could present that search warrant application to Judge Falk, who would resume handling criminal duty matters over the weekend.

As a threshold matter, the Government acted in complete good faith.  It neither knowingly nor intentionally misrepresented any facts vis-à-vis the investigation, the underlying crimes, or the authorization it was seeking.  The Government categorically denies the defendant's accusations of "judge shopping," *see* Mobile Equipment Motion at 22—that the Government went to Judge Falk over the weekend in order to avoid going back to Judge Shwartz. After Judge Shwartz limited the Government's application, the undersigned Assistant U.S. Attorney candidly advised Judge Shwartz that, given her concerns, the Government would be seeking broader authority to use the Mobile Equipment under a Rule 41 search warrant.  The undersigned Assistant U.S. Attorney inquired whether the Government should present that application to Judge Shwartz or return to Judge Falk.  Judge Shwartz

---

it leads them to believe that they have identified a single residence or private space within which the [Williams Cell Phone] may be located."

69

indicated that the Government could present the search warrant application to Judge Falk, for whom she was just covering that day and who would resume handling criminal duty matters over the weekend.[24]

Given the urgency of the situation—exacerbated by the fact that the defendant had pointed a firearm at an off-duty police officer when fleeing from the then-recent seventh armed robbery—the undersigned Assistant U.S. Attorney and the FBI prepared a search warrant affidavit on Friday evening and Saturday, and then drove to Judge Falk's home on Sunday, July 15, 2012.

The fact that Judge Shwartz had limited the Government's ability to use the Mobile Equipment under a 2703(d) standard was completely immaterial to Judge Falk's Rule 41 probable cause determination. Indeed, Judge Shwartz authorized the FBI to use the Mobile Equipment, but limited the FBI "*absent other authority*, to locate the [Williams Cell Phone] in any private place or where they have reason to believe that the [Williams Cell Phone] is in a private place." *See* Exhibit F, pgs. 4-5 (Order, Mag. No. 12-3092) (emphasis supplied). Judge Shwartz did so because the Government had proceeded under 2703(d)'s lower standard. Because the Government was presenting to Judge Falk a Rule 41 search warrant, which required a higher, probable cause standard, Judge

---

[24] Indeed, just five days later, the Government submitted to Judge Shwartz an application for authorization to install a GPS-tracker on the defendant's vehicle and that application specifically referenced the search warrant that had been submitted to Judge Falk on Sunday, July 15, 2012. *See* Exhibit J, ¶ 19 (Affidavit, Mag. No. 12-3114).

Shwartz's limitation was immaterial.

Equally unpersuasive is the defendant's argument that Judge Shwartz's amendment to the 2703(d) order "would have given Judge Falk pause about the legality of using it." Mobile Equipment Motion at 21. In July 2012, it was standard practice in the District of New Jersey to apply for authority to use the Mobile Equipment under the hybrid authority of both 18 U.S.C. §§ 2703(d) and 3122, and magistrate judges routinely authorized the use of the Mobile Equipment under such applications. Indeed, that is the reason that the application to Judge Shwartz was made under 2703(d) in the first place.

Nor did the Government merely change the formal legal basis under which it made the second application for authority to use the Mobile Equipment. As described earlier, the affidavit submitted to Judge Falk in support of the search warrant included several additional facts that were not contained in the original 2703(d) application made to Judge Shwartz. *Compare* Exhibit E, pgs. 3-6 (Appl., Mag. No. 12-3092), *with* Exhibit G, pgs. 4-8 (Affidavit, Mag. No. 12-3679).

In fact, courts have denied *Franks* claims even when the same exact affidavit, previously rejected by one judge, is presented to and approved by a second judge. The Seventh Circuit, for example, has explained that it did "not think that the fact that Magistrate Weisberg had denied a warrant on the same showing is material in the sense *Franks* requires; even if it had included this fact, Morley's affidavit would still have been sufficient to show probable cause."

71

*United States v. Pace*, 898 F.2d 1218, 1233 (7th Cir. 1990).

Here, in contrast, Judge Shwartz limited the Government's application because it had not been presented as a probable cause search warrant, the Government advised Judge Shwartz that it would then seek a search warrant, obtained her approval to present the search warrant to Judge Falk, and added additional facts to the search warrant affidavit.

The defendant's request for a *Franks* hearing is groundless and should therefore be denied.

### 2. The Search Warrant Affidavit Does Not Contain Any Material Misleading Statements or Omissions Related to the Mobile Equipment

The defendant reiterates his spurious claim that the Government did not adequately describe the Mobile Equipment and requests a *Franks* on that basis as well.  Mobile Equipment Motion at 23.

The defendant itemizes the following statements or omissions, which he claims are materially false:

- An "affirmative statement that they intended to use a 'mobile pen register device'"

- "[F]ailed to acknowledge that the [Mobile Equipment] will scoop up all signaling information from phones used by the target, including from phones and at times and locations unrelated to suspected criminal activity" and "from phones used by third parties as to whom the government lacks probable cause or even reasonable suspicion"

- "[F]ailure to acknowledge that [the Mobile Equipment is] capable of capturing content and to address

72

> whether that function has been disabled on the
> particular device"

Mobile Equipment Motion at 23.

But, as already discussed, the search warrant affidavit properly advised

Judge Falk about each of the first two points above.

- After explaining how the device worked *for a page-and-a-half*, the affidavit explained that the Mobile Equipment would receive "signals" from the cell phone and determine "the strength of those signals," thus permitting it to "determine the location from which the [cell phone] is most likely emitting signals," exhibit G, ¶ 24 (Affidavit, Mag. No. 12-3679).

- The affidavit explicitly stated that the Mobile Equipment would acquire "data incidentally from phones other than the [Williams Cell Phone]" and it advised the Court that such data "shall not be recorded and/or retained beyond its use to identify or locate the [Williams Cell Phone]," *id.* ¶ 28.

With respect to the defendant's third point, the FBI was *not* seeking authority

to "captur[e] content," and neither did Judge Falk's search warrant authorize it

to do so.  Nor did the FBI actually use the Mobile Equipment to capture any

content.  It was thus completely irrelevant whether the Mobile Equipment is or

is not capable of capturing content.  Nor, as the defendant suggests (*see* Mobile

Equipment Motion at 25), did the search warrant need explicitly to prohibit the

FBI from capturing real-time content.  The well-trained FBI agents working this

case were well aware that 18 U.S.C. § 2511 prohibits such investigative activity

without a Title III wiretap order.[25]

### C. The Defendant's Motion for Additional Discovery Regarding the Mobile Equipment Should be Denied

In his Omnibus Motion, the defendant requests three pages' worth of information pertaining to the Mobile Equipment, including technical information about its capacity and capabilities, the FBI's policies and procedures regarding its use, and data gathered by the Mobile Equipment related to other cell phones.  Omnibus Motion at 10-12.  The Government has advised the defendant that no data gathered by the use of the Mobile Equipment was retained and that it therefore does not intend to present at trial any data gathered by the Mobile Equipment.[26]  Nor has the defendant shown a specific need for the laundry-list of sensitive information that he seeks.

---

[25] The defendant's other complaints about the search warrant are also meritless.  He suggests that the search warrant did not set "limits on when, where and for how long the device is operated," that it did not "minimize the intrusion on third parties," and that it did not address "the question of what to do with [third-party] information."  Mobile Equipment Motion at 25.  To the contrary, the affidavit advised the court that the FBI would "reasonably limit[] the scope and duration of the use of the Mobile Equipment" in order to minimize disruption to cellular service to other customers.  Exhibit G ¶ 27 (Affidavit, Mag. No. 12-3679).  It also explained that "data incidentally acquired from [other] phones" would "not be recorded and/or retained beyond its use to identify or locate the" Williams Cell Phone.  *Id.* ¶ 28.  Finally, the search warrant restricted the FBI's use of the Mobile Equipment to 30 days and permitted the FBI to execute the warrant "at any time in the day or night, as the Court finds that reasonable cause has been established."  Exhibit H, pg. 6 (Search Warrant, Mag. No. 12-3679).

[26] In addition, as explained in the search warrant affidavit authorizing the use of the Mobile Equipment, any data incidentally [acquired] from phones other than the Williams Cell Phone" was also destroyed.  Exhibit G ¶ 28 (Affidavit, Mag. No. 12-3679).  Further, the FBI does not retain any data, whether from the target cell phone or third-party cell phones, obtained from the Mobile Equipment.

Following the Supreme Court's decision in *Roviaro v. United States*, 77 U.S. 623 (1956), numerous courts have held that the Government is entitled to a law enforcement privilege. *United States v. Van Horn*, 789 F.2d 1492, 1507 (11th Cir. 2012) ("We recognize a qualified government privilege not to disclose sensitive investigative techniques" and "hold that the privilege applies to the nature and location of electronic surveillance equipment."); *United States v. Rigmaiden*, 844 F. Supp. 2d 982, 988 (D. Ariz. 2012) (denying defendant's motion to obtain information related to the specific mobile tracking device used by the FBI). Although the privilege recognized in *Roviaro* can be overcome, a defendant must show a specific "need for the information" sought. *Rigmaiden*, 844 F. Supp. 2d at 989; *see also Van Horn*, 789 F.2d at 1508.

In *Rigmaiden*, the defendant made requests similar to the ones that Mr. Williams makes here, including requests for "detailed technical information related to the devices and used during the mission," "information showing the geographical paths of the wireless device locators," "user manuals, test data, and related software," and communications between the government and private entities." *See* 844 F. Supp. 2d at 998-1004. The court denied those requests, concluding that such information was privileged. The court further explained that "[d]isclosure would enable adversaries of law enforcement to defeat electronic surveillance operations and to avoid detection by such surveillance" and would "place law enforcement agents at risk when conducting such surveillance." *Id.* at 994, 1002.

75

Here, the defendant has not explained how access to the requested information is necessary to his defense.  No data gathered through the use of the Mobile Equipment was retained, and therefore the Government does not intend to present at trial any data obtained by the Mobile Equipment.  Further, because law enforcement here obtained a Rule 41 search warrant, based on a showing of probable cause, there is no need for a suppression hearing at which the requested information would be necessary.

For these reasons, the defendant's discovery expansive requests for law enforcement sensitive information should be denied.

## IV.   THE GOOD-FAITH EXCEPTION TO THE EXCLUSIONARY RULE WOULD APPLY HERE

Even if the Court were to find probable cause lacking or that 2703(d) did not authorize the Government to obtain cell-site records—and there is no legal or factual basis for doing so—the good faith exception would apply.

In *United States v. Leon*, the Supreme Court recognized that the purpose of the exclusionary rule—deterring police misconduct—would not be furthered by suppressing evidence obtained during a search "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope."  468 U.S. 897, 919-20 (1984).  Under the good-faith exception, "evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth

76

Amendment." *Herring v. United States*, 555 U.S. 135, 143 (2009). The good-faith exception to the exclusionary rule has since been applied when law enforcement conducts a search in objectively reasonable reliance "on a warrant later held invalid," "on subsequently invalidated statutes," and "on binding judicial precedent." *Davis v. United States*, 131 S. Ct. 2419, 2428-29 (2011); *see also Illinois v. Krull*, 480 U.S. 340 (1987).

Here, the Government obtained cell-site records pursuant to a 2703(d) order in objectively reasonable reliance on valid statute (18 U.S.C. § 2703) and on the *Third Circuit Cell-Site Decision*, which was decided in 2010, well before the Eleventh's Circuit's decision in *Davis*. It also obtained other cell-site records and used the Mobile Equipment in objectively reasonable reliance on a Rule 41 search warrant issued by Judge Falk.

Accordingly, even if the Court were to find that the Government violated the Fourth Amendment, the exclusionary rule is inapplicable.

## V. THERE HAS BEEN NO *MIRANDA* VIOLATION, AND CLAUDE WILLIAMS' POST-ARREST STATEMENTS SHOULD BE ADMITTED

In his Motion to Suppress Statements, Mr. Williams asserts that because he clearly and unequivocally invoked his right to counsel, law enforcement should not have continued to interview him. Accordingly, he argues, his confession should be suppressed. However, this conclusion is erroneous. To the contrary, when viewed in light of the facts and circumstances surrounding his interrogation, Mr. Williams' references to counsel are best understood as

77

expressing a desire to meet with an attorney at some future point in time.

Moreover, even when viewed in the light most favorable to Mr. Williams, his statements are at best ambiguous and cannot fairly be said to be an unequivocal invocation of the right to counsel, such that the interview should have been terminated.  Accordingly, for the reasons set forth below, there has been no *Miranda* violation, and all of Mr. Williams' statements to law enforcement on July 30, 2012 should be admitted.

### A. A Suspect Must Clearly and Unequivocally Invoke the Right to Counsel

A suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning.  *See Miranda v. Arizona*, 384 U.S. 436, 469-73 (1966) ("*Miranda*") (cited in *Davis v. United States*, 512 U.S. 452, 456 (1994) (quotations omitted)).  *Miranda* also requires that law enforcement explain this right to a suspect before he can be questioned.  *Id.*  If a suspect waives his right to counsel after being so informed, law enforcement is then free to question him.  *Davis*, 512 U.S. at 458 (citing *North Carolina v. Butler*, 441 U.S. 369, 372-76 (1979)).  However, if a suspect requests counsel at any time during the interview, questioning must stop until an attorney has been made available to the suspect (or unless the suspect reinitiates conversation).  *Id.* (citing *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)).

## 1. The Key Inquiry is Whether a Suspect's Reference to Counsel is Clear or Ambiguous

When confronted with a suspect's statements regarding counsel, courts must first "determine whether the accused *actually invoked* his right to counsel." *Edwards*, 451 U.S. at 484-85 (citing *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (*per curiam*)).  Importantly, the test hinges on the suspect's actual words—not on the "likelihood that a suspect would wish counsel to be present." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991).  Put differently, courts focus almost entirely on whether a suspect's statements regarding counsel are clear or ambiguous.  *See, e.g., Alston v. Redman*, 34 F.3d 1237, 1245 (3rd Cir. 1994) ("[Edwards]...requires, at a minimum, some statement that can reasonably be construed to be expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police*") (emphasis in original) (citation omitted); *Flamer v. Delaware*, 68 F.3d 710, 725 (3rd Cir. 1995) ("If a suspect makes a reference to an attorney that is ambiguous or equivocal . . . *Edwards* does not come into play.") (internal quotation marks and citation omitted); *Boretsky v. Ricci*, Civil No. 09-0771 (FLW), 2012 U.S. Dist. LEXIS 26447,at *58 (D.N.J. Feb. 29, 2012) ("[a] statement either is...an assertion of the right to counsel or it is not."); *Muhammad v. New Jersey*, No. 05-0296, 2007 U.S. Dist. LEXIS 12247, at *19 n.3 (D.N.J. Feb. 21, 2007) ("[L]aw enforcement officers may continue questioning until and unless the suspect *clearly requests* an attorney.") (emphasis added) (internal quotation

79

marks and citations omitted); *United States v. Hunter*, 708 F.3d 938, 942 (7th Cir. 2013) ("Once a court decides whether a defendant's request for counsel is ambiguous, the analysis is simple.  Unfortunately, in most cases...the difficult decision is whether the defendant's request for counsel was ambiguous."); *Walton v. Falk*, No. 13-cv-403, 2014 U.S. Dist. LEXIS 61308, at *15 (D. Colo. May 1, 2014) ("A request is ambiguous if it is of a type that gives rise to opposing inferences.") (quoting *Davis*, 512 U.S. at 459); *United States v. Smith*, No. 13-CR-20263, 2013 U.S. Dist. LEXIS 151899, at *18 (E.D. Mich. Oct. 23, 2013) ("[T]he request must indicate the suspect's 'desire to deal with the police *only through* counsel.'" (quoting *McNeil*, 501 U.S. at 179)) (emphasis added).

This inquiry is an "objective" one.  *Davis*, 512 U.S. at 459 (citing *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987)).  A "suspect must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."  *Boretsky*, 2012 U.S. Dist. LEXIS at *58 (quoting *Davis*, 512 U.S. at 459) (internal quotation marks omitted); *see also Flamer*, 68 F.3d at 725 (describing analysis as whether "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel").  Accordingly, where officers "reasonably do not know whether or not the suspect wants a lawyer," there is no requirement that they cease interrogation.  *Boretsky*, 2012 U.S. Dist. LEXIS at *58 (citation

80

omitted).[27]

## 2. Courts Must Consider the Context Within Which the Statement is Made

When undertaking this inquiry, the case law makes clear that the context in which a suspect refers to counsel is crucial to determining whether a statement is, or is not, ambiguous.  *See, e.g., Flamer*, 68 F.3d at 725 (holding that "reasonable officers" can consider a suspect's statements "in light of the circumstances" in which they were made); *Hunter*, 708 F.3d at 943 (holding that courts can consider prior context in which a statement is made when inquiring as to whether a defendant unambiguously revoked his right to counsel); *United States v. Sierra-Estrada*, 248 Fed. App'x 973, 981-82 (9th Cir. 2007) (examining the "circumstances surrounding" a suspect's waiver of *Miranda*, including the suspect's statements and the circumstances surrounding the suspect's waiver, to determine that his references to counsel were ambiguous); *Scott v. Martel*, Crim. No. 12-0717, 2013 U.S. Dist. LEXIS 53194, at *32-33 (N.D. Cal. April 12, 2013) (referring to the "context of the entire exchange"—including the fact that the suspect "indicat[ed] to the interviewing officers that he was indeed willing to talk to them" despite also

---

[27] This is because the prohibition on further questioning is justified solely by reference to its "prophylactic purpose," *Davis*, 512 U.S. at 458, namely the right against self-incrimination.  To require officers to cease questioning in the face of objectively ambiguous statements would "transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity."  *Boretsky*, 2012 U.S. Dist. LEXIS at *58 (quoting *Davis*, 512 U.S. at 459-60) (internal quotations omitted).

referring to the fact that he "might" want a lawyer—to hold that suspect's statements were ambiguous); *Matthews v. McKee*, Civ. No. 06-15253, 2009 U.S. Dist. LEXIS 4454, at *19-20 (E.D. Mich. Jan. 22, 2009) (rejecting the defendant's attempt to "remove[] various requests for counsel from the transcript and cite[] to the statements *in isolation* and holding that "based on our review of the statements of requests for counsel *in context*, we cannot conclude that the trial court's factual conclusions were clearly erroneous . . . .") (emphasis added).

### B. Claude Williams' Statements Regarding Counsel Were Ambiguous

Mr. Williams claims that his first statement regarding counsel was an "unequivocal[] and unambiguous[]" invocation of the right to counsel. [28]  *See* Motion to Suppress Statements at 1.  Saying it, however, does not make it so. To the contrary, no reasonable law enforcement officer would understand either of Mr. Williams' statements to be an unambiguous request for counsel. Accordingly, there was no *Miranda* violation, and the Court should hold that Mr. Williams' statements, including his confession, are admissible.

---

[28]  As described above in Section C of the Statement of Facts, Mr. Williams made two references to counsel.  *See* Exhibit L at 12, 37.  In his Motion to Suppress Mr. Williams only discusses the first statement in arguing that he invoked his right to counsel.  While Mr. Williams has arguably waived any argument that the second reference to counsel constituted a clear invocation of his Fifth Amendment rights, the Government will address both statements herein.

### 1. The Defendant's First Statement Regarding Counsel Was Ambiguous

As noted above in Section C of the Statement of Facts, prior to the start of the interrogation, Mr. Williams was read his *Miranda* rights—including the right to have counsel present prior to being interrogated—which he verbally acknowledged.  Mr. Williams was also asked to sign a *Miranda* waiver form, which reiterated the *Miranda* warnings and contained a clause stating, "I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."  *See* Exhibit M.  Mr. Williams signed this form indicating he understood his rights under *Miranda*.

After waiving his *Miranda* rights, Mr. Williams agreed to answer law enforcement's questions.  At approximately 13 minutes into the interrogation, the defendant made the following reference to counsel during an exchange with law enforcement:

> JV:  I would like to hear you say I'm willing to accept responsibilities for --
>
> CW:  I'm willing to accept for the things that I was doing and whatnot, but um, *at the same time,* I mean like, you, you gotta like let me be able to like talk to my lawyer, not get myself a thousand years, I mean, I'm old already.  I'm probably going to die anyway.

*See* Exhibit L at 12 (emphasis added).

A reasonable law enforcement officer would not understand the

defendant's statement to be a clear and unequivocal request for counsel.  Mr. Williams first tells law enforcement that he is "willing to accept [responsibility] for the things that [he] was doing and whatnot . . . ."  *See id.* at 12.  Then, he equivocates and tells law enforcement that "*at the same time* . . . you gotta . . . let me be able to . . . talk to my lawyer, not get myself a thousand years, I mean, I'm old already."  *See id.*  When read in its entirety, Mr. Williams' statement is best understood as expressing a desire to *both* confess *and* to talk to his attorney at some point in order to limit his exposure at sentencing.  This, in itself, is not a clear request for the immediate assistance of counsel in dealing with custodial interrogation by law enforcement.  *Alston*, 34 F.3d at 1245 (quotation marks omitted).

This interpretation is bolstered by the context within which Mr. Williams made his statement.  Prior to making reference to counsel, Mr. Williams was given *Miranda* warnings—which he indicated he understood—as well as written *Miranda* warnings, which he initialed.  Mr. Williams did not hesitate or ask any questions prior to waiving his *Miranda* rights.  During his interrogation, Mr. Williams also indicated that he understood the *Miranda* warnings that had been given to him by acknowledging that his statements to law enforcement "could be used against me."[29]  *See* Exhibit L at 10.

---

[29] In his Motion to Suppress, Mr. Williams has also acknowledged that he paraphrased the *Miranda* warnings and understood that his statements could be used against him.  *See* Motion to Suppress Statements at 6.

84

Thus, Mr. Williams' reference to counsel was made following his "deliberate choice to relinquish" his *Miranda* rights, which he indicated he understood by paraphrasing them back to law enforcement.  *Scott*, 2013 U.S. Dist. LEXIS 53194, at *32 ("[T]he law presumes that an individual who fully understands his rights and acts in a manner inconsistent with them has made 'a deliberate choice to relinquish the protection those rights afford.'").  Based on Mr. Williams' deliberate waiver of *Miranda*, not to mention the fact that he understood the risk associated with such a waiver, it was reasonable for law enforcement to conclude that, had Mr. Williams wanted the immediate assistance of counsel during the interrogation, he could have made such a request clearly and unequivocally.

In addition, aside from his deliberate waiver of *Miranda* rights, Mr. Williams gave every indication to law enforcement that he wanted to discuss his role in the robberies, based on the following statements that he made prior to referring to counsel:

- He twice told law enforcement that his co-conspirators—the "people that you're thinking that were involved" with the bank robberies—were not actually involved;

- He admitted that he owned the green Ford Taurus, but that he had another woman register it for him, and he knew that law enforcement had already spoken with her; and

- He was trying to be "square" with law enforcement and to "answer [their] questions fairly."

85

*See* Exhibit L at 4, 6, 9, 10-11.

In short, based on the overall tenor of the interview, the most objectively reasonable interpretation of Mr. Williams' statement was that he wanted to continue speaking with law enforcement and confess his role in the bank robberies, but he also at some point in the future wanted an opportunity to speak with an attorney to limit his sentencing exposure.  As discussed *infra*, the case law is clear that a request for an attorney at some future point is *not* a clear and unequivocal expression of a desire for the assistance of an attorney in dealing with custodial interrogation by law enforcement.  *See Alston*, 34 F.3d at 1245; *see also McNeil*, 501 U.S. at 179 (invocation of the right to counsel must indicate the suspect's "desire to deal with the police *only through counsel*") (emphasis added).

Moreover, even if the Court interprets the reference to counsel as sympathetically as possible toward Mr. Williams (which it is not required to do), it is still clear that Mr. Williams' statement is at best equivocal and ambiguous. A reasonable law enforcement officer could interpret Mr. Williams as expressing arguably conflicting desires—to both speak with law enforcement about his role in the robberies and with an attorney about sentencing.  This, in itself, is equivocal, because the statement gives rise to "opposing inferences," *Walton*, 2014 U.S. Dist. LEXIS 61308, at *16, regarding whether Mr. Williams has "a *present desire* to consult with counsel," *Hunter*, 708 F.3d at 946 (emphasis

86

added), as opposed to a *future desire* to speak with an attorney about the potential sentence he might receive.

Regardless of the myriad interpretations of the defendant's statement, one thing is clear:  it is precisely the type of statement that courts have held is ambiguous.  *See, e.g., Walton*, 2014 U.S. Dist. LEXIS 61308, at *16 (statement that defendant "would or might talk to [officer] when he was with a prosecutor and a lawyer" and that defendant would "sit down with an attorney and district attorney and talk" held ambiguous); *Smith*, 2013 U.S. Dist. LEXIS 151899, at *17-18 (request to "call my girl so I can tell her to get me a lawyer ready" ambiguous because it might have reflected desire to get a lawyer "at some future point in time"); *Pena v. McDonald*, Civ. No. 09-976, 2012 U.S. Dist. LEXIS 22057, at *22-23 (C.D. Cal. Jan. 6, 2012) (asking "[c]an I get a lawyer...I can't pay for one" held ambiguous because it could be referring to getting a lawyer in the future); *Matthews*, 2009 U.S. Dist. LEXIS 4454, at *21, fn. 4 (where defendant made statements indicating that he "wanted to speak to police and his lawyer at the same time" this was deemed ambiguous); *United States v. Micek*, Crim. No. 00-267, 2001 U.S. Dist. LEXIS 937, at *5-6 (D. Neb. Jan. 23, 2001) (holding that statement "I do want a lawyer, but I will talk to you" is ambiguous); *LaFevers v. Gibson*, 182 F.3d 705, 713 (10th Cir. 1999) (holding that, during interrogation, defendant's request for assistance of counsel when law enforcement sought body samples was ambiguous).

Moreover, an examination of the facts in *Edwards*—which is in many

respects the paradigmatic case regarding the unequivocal invocation of counsel —also makes clear why the defendant's statement regarding counsel is ambiguous.  In *Edwards*, as in the instant case, the suspect was being interrogated by law enforcement after waiving his *Miranda* rights.  During the interrogation, the *Edwards* suspect told law enforcement that he wanted to "make a deal."  *Id.*, 451 U.S. at 479.  After unsuccessfully attempting to contact an attorney, the suspect then told law enforcement, "I want an attorney before making a deal."  *Id.*

This statement stands in stark contrast to Mr. Williams' ambiguous reference to counsel in the instant case.  In *Edwards*, the suspect evidenced a *clear and present desire* for counsel before he would agree to speak further with law enforcement.  In contrast, Mr. Williams told law enforcement that he wanted *both* to "take responsibility" for his actions *and* to talk (at some point) with a lawyer, ostensibly to reduce his potential sentencing exposure.  This cannot fairly be said to be either a "clear[] request[]" for an attorney or a "desire to deal with the police only through counsel."  *Muhammad*, 2007 U.S. Dist. LEXIS 12247, at *19 n.3; *McNeil*, 501 U.S. at 179.

In short, based on Mr. Williams' waiver of *Miranda* and his apparent willingness to speak with law enforcement, it is entirely reasonable that a law enforcement officer would interpret the defendant's reference to counsel as ambiguous, especially where the reference to counsel was made contemporaneously with Mr. Williams' expressed desire to "accept"

88

responsibility for the "things [he] was doing."  *See* Exhibit L at 12. Accordingly, the defendant's *Miranda* right to counsel was not violated, and his statements are admissible.

## 2. The Defendant's Second Statement Regarding Counsel Was Ambiguous

At approximately 54 minutes into the interrogation, the defendant made his second reference to counsel, which occurred during the following exchange:

> JV:  I wanted you to be honest with what you did.  I mean cause I know what this depicts, and I know what a jury of your peers believes this depicts.  They'd always rather hear it from your mouth.  That you could explain, yes that's me, no that's not me, yes that's me, that I did it for this reason.  I mean, I, I've given you every opportunity.

> CW:  Okay, well I'm, I'm sorry that I got them involved in being here or whatever, but ah, they didn't have anything to do that this is all my stupid shit, you know.  And I'm, I'm with my lawyer, I'm willing to sit down and say yeah this is what I did, this is what I did, whatever, you know what I'm saying but don't, don't seem like you all like really trying to help me here.

*See* Exhibit L at 37.

A reasonable law enforcement officer would not interpret this statement as a "clear[] request[]" for counsel, either.  *Muhammad*, 2007 U.S. Dist. LEXIS 12247, at *19 n.3.  Mr. Williams indicates a desire to speak about his criminal behavior, telling law enforcement that he is "sorry" that he got others involved and that "this is all my stupid shit, you know."  *See id.*  He then indicates a

89

desire to "with my lawyer . . . sit down and say yeah this is what I did . . . ."
*See* Exhibit L at 37.  Once again, the most reasonable interpretation of Mr.
Williams' statement is that he wants both to speak with an attorney and admit
to his role in the bank robberies.  This is simply not an unequivocal request to
deal with law enforcement only through counsel.  *See, e.g., Smith*, 2013 U.S.
Dist. LEXIS 151899, at *18.

This interpretation is similarly bolstered by the facts and circumstances
of the interview.  As noted above, Mr. Williams confessed to a number of the
bank robberies and attempted (falsely) to  deflect suspicion from his co-
conspirators no less than 14 times immediately prior to his second reference to
counsel.  Mr. Williams also went fishing for a deal, asking law enforcement if
they could secure him a specific sentence.  *See infra* at 26.  When set against
this backdrop, it was wholly reasonable for law enforcement to conclude that
Mr. Williams' second reference to "sit[ting] down with counsel" and saying "this
is what I did" was in keeping with Mr. Williams' desire both to confess and to
secure a favorable sentence for himself.  *See infra* at 24.

Furthermore, even if the Court interprets the statement in a light most
favorable to Mr. Williams (which, again, it is not required to do), it would not
make Mr. Williams' statement any less confusing or ambiguous.  This is
because Mr. Williams muddies the waters by stating that he wants to "sit down
and say yeah this is what I did, this is what I did" "*with my attorney.*"  *See*
Exhibit L at 37 (emphasis added).  Accordingly, it is at best unclear whether

90

Mr. Williams was indicating he wanted counsel present while he confesses to

law enforcement, or whether he wanted separately to meet with counsel to

detail his criminal conduct.  The fact that Mr. Williams' statement is

susceptible to multiple interpretations compels only one conclusion:  The

defendant's statement is ambiguous because it "gives rise to opposing

inferences" about whether the defendant actually wanted counsel.  *See*, *e.g.*,

*Walton*, 2014 U.S. Dist. LEXIS 61308, at *15.

In short, Mr. Williams' second reference to counsel is no clearer than his

first.  In both instances, he conveyed to law enforcement a desire both to

confess and accept responsibility for the bank robberies and to speak with an

attorney.  Based on the face of the statements and the circumstances of Mr.

Williams' interrogation, it was unclear whether Mr. Williams was making a

contemporaneous request for counsel to assist in the interrogation or whether

he was expressing a desire to speak with counsel at some other, future point in

time.  This is hardly a "clear assertion not to answer any further questions

without the presence of an attorney," *United States v. Korbe*, 2:09-cr-05, 2010

U.S. Dist. LEXIS 57260, at *23 (W.D. Pa. June 9, 2010), and as such, there has

been no *Miranda* violation.

### C. In the Alternative, if the Court Holds that a *Miranda* Violation Has Occurred, the Defendant's Statements Made Prior to His First Reference to Counsel Should Be Admitted

If the Court holds that the defendant's first reference to counsel is an

unequivocal invocation of the right to counsel, it should nonetheless hold that

Mr. Williams' post-*Miranda* statements to law enforcement, made prior to the invocation, are admissible.  As detailed above in the Statement of Facts, Mr. Williams was given *Miranda* warnings and immediately chose to waive his rights.  He then made a number of statements to law enforcement prior to his first reference to counsel.  The Court should thus hold that these statements are admissible.  *See*, *e.g.*, *Edwards,* 451 U.S. at 485 (authorities were not prohibited from using incriminating statements made by suspect prior to invocation of right to counsel).

## VI.   LAW ENFORCEMENT DID NOT COERCE CLAUDE WILLIAMS' POST-ARREST STATEMENTS AND THOSE STATEMENTS SHOULD THEREFORE BE ADMITTED

In his Motion to Suppress, Mr. Williams argues that because law enforcement induced him to confess on the basis of misleading legal advice, his confession was involuntary and should therefore be suppressed.  However, as discussed below, the facts and circumstances surrounding Mr. Williams' statements, including his confession, make clear that law enforcement did not use improper deceptive tactics or otherwise coerce Mr. Williams into confessing.  Accordingly, Mr. Williams' confession was not obtained in contravention of his constitutional rights, and it is therefore admissible.

### A. A Confession Must Be Voluntary To Be Admissible

Pursuant to the Fifth and Fourteenth Amendments, a confession must be voluntary to be admitted into evidence.  *Locust v. Ricci*, Civ. No. 08-2713 (SRC), 2011 U.S. Dist. LEXIS 142871, at *43-44 (D.N.J. Dec. 12, 2011); *see also*

92

*Sweet v. Tennis*, 386 Fed. App'x 342, 345 (3rd Cir. 2010) ("It is clear that only voluntary confessions may be admitted at the trial of guilt or innocence.") (quoting *United States v. Swint*, 15 F.3d 286, 288-89 (3rd Cir. 1994)) (internal quotation marks omitted).  As stated above, a suspect can waive his *Miranda* rights, but he must do so "voluntarily, knowingly and intelligently."  *Locust*, 2011 U.S. Dist. LEXIS 142871, at *43 (internal quotation marks and citation omitted); *see also Halsey v. Pfeiffer*, 750 F.3d 273, 304 (3rd Cir. 2014) ("[T]he ultimate question is 'whether the defendant's will was overborne when he confessed.") (quoting *Miller v. Fenton*, 796 F.2d 598, 603 (3rd Cir. 1986)); *Pena v. Prelesnik*, Civ. No. 11-450, 2013 U.S. Dist. LEXIS 184265, at *69 (W.D. Mich. Aug. 12, 2013) (asking whether "a defendant's will was overborne in a particular case") (internal quotation marks and citations omitted).  Notably, in assessing the voluntariness of a suspect's statements, the Supreme Court has held that "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare."  *Locust*, 2011 U.S. Dist. LEXIS 142871, at *45 (quoting *Dickerson v. United States*, 530 U.S. 428, 433 (2000)).

### 1. Courts Must Consider the Totality of the Circumstances When Deciding Whether a Statement is Voluntary

In determining whether a suspect's statement is voluntary, Supreme Court precedent requires consideration of the "totality of all the surrounding

circumstances—both the characteristics of the accused and the details of the interrogation." *Locust*, 2011 U.S. Dist. LEXIS 142871, at *45-46 (quoting *Dickerson*, 530 U.S. at 434 (internal quotation marks omitted); *see also Sweet*, 386 Fed. App'x at 345 ("The ultimate question in the voluntariness calculation is whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution.") (citation omitted).

The "totality of the circumstances" test requires courts to consider "both the characteristics of the accused and the details of the interrogation." *Locust*, 2011 U.S. Dist. LEXIS 142871, at *45-46 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)); *see also United States v. Swint*, 15 F.3d 286, 289 (3rd Cir. 1994) (listing factors that courts consider under totality of the circumstances test). This includes evaluating a suspect's "age, education, experience, background, and intelligence, [and] whether he has the capacity to understand the warnings" that were given to him. *Locust*, 2011 U.S. Dist. LEXIS 142871, at *45-46. In addition, courts should consider whether a suspect understands the *Miranda* rights and the consequences of waiving those rights, the length of detention, the nature of the questioning, and the use of any physical punishment. *Locust*, 2011 U.S. Dist. LEXIS 142871, at *45-46 (citations omitted). Finally, courts should analyze the suspect's familiarity with the criminal justice system, and the timing of the *Miranda* warnings relative to the statement given. *Id.* (citations omitted).

In applying the totality of the circumstances test, "coercive police activity is a *necessary predicate* to a finding that a confession is not 'voluntary'. . . ." *Id.* at \*48 (emphasis added) (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)); *Sweet*, 386 Fed. App'x at 347 (same); *see also Swint*, 15 F.3d at 289 (describing the element of police coercion as being "crucial" to determining whether a confession was voluntary).  Moreover, such "police overreaching" must be "causally related to the confession." *Locust*, 2011 U.S. Dist. LEXIS 142871, at \*48*; see also Swint*, 15 F.3d at 289 (same).  Where no such "police overreaching" that is causally linked to the confession exists, "there is simply no basis for concluding" that law enforcement has deprived a suspect of their rights under the Fifth and Fourteenth Amendments.  *Locust*, 2011 U.S. Dist. LEXIS 142871 at \*49 (citation omitted).

### 2. Law Enforcement is Entitled to Employ Psychological Tactics

While the Constitution prohibits impermissible coercion, a confession is "not rendered involuntary simply because the police procured it by using psychological tactics." *Halsey*, 750 F.3d at 304 (citing *Miller*, 796 F.2d 598, 604); *see also Henderson v. Hendricks*, Civ. No. 02-4338 (MLC), 2005 U.S. Dist. LEXIS 32897, at \*30-31 (D.N.J. Dec. 13, 2005) (distinguishing between "objectively coercive police conduct" and other types of "psychological tactics" that police are entitled to use") (citation omitted).  Thus, the use of deception does not *per se* render a confession inadmissible at trial.  *See Halsey*, 750 F.3d

95

at 304 (citing *Frazier v. Cupp*, 394 U.S. 731, 739 (1969)).  In fact, it is "generally recognized" that law enforcement may use "some psychological tactics" in order to elicit statements from a suspect, including lying about whether a co-defendant has confessed and telling a suspect that "cooperation would promote leniency."  *Henderson*, 2005 U.S. Dist. LEXIS 32897, at *31 (citations omitted); *see also Pena*, 2013 U.S. Dist. LEXIS 184265, at *70 ("[W]e have no doubt that effective interrogation techniques require, to some extent, a carrot-and-stick approach to eliciting information from an uncooperative suspect.") (citation omitted).

More specifically, a "promise to recommend leniency" or "speculation that cooperation with have a positive effect" will not automatically render a suspect's statements involuntary.  *Pena*, 2013 U.S. Dist. LEXIS 184265, at *71 (quoting *United States v. Wiley*, 132 Fed. App'x 635, 640 (6th Cir. 2005)) (internal quotation marks omitted); *see also United States v. Romano*, Civ. No. 12-691, 2013 U.S. Dist. LEXIS 133613, at *16-17 (E.D.N.Y. Sept. 18, 2013) (holding that "although . . . agents suggested that cooperation would be in Defendant's best interests because '*it would be made known to the prosecutors and judge* . . . this falls far short of coercion . . . .") (emphasis added) (citation omitted); *United States v. Corbett*, 750 F.3d 245, 253 (2nd Cir. 2014) (distinguishing between "unfulfillable promises or . . . misrepresentations" and "vague promises of leniency for cooperation," the latter which "will not, without more, warrant a finding of coercion") (citation omitted); *United States v.*

96

*Arterberry*, Crim. No. 99-21183, 2001 U.S. App. LEXIS 32262, at *6-7 (5th Cir. Apr. 20, 2001) (holding that officer's statement about cooperating "result[ing] in a deduction of points" used to calculate defendant's sentence was not a "gross misrepresentation" and that no coercion or improper promises occurred).  In short, law enforcement is entitled to "attempt[] to create a climate which would be conducive to extracting inculpatory information."  *Henderson*, 2005 U.S. Dist. LEXIS 32897, at *31.

### B. Claude Williams' *Miranda* Waiver Was Lawfully Obtained

Mr. Williams does not appear to challenge the validity of the context in which his *Miranda* waiver was obtained.  This is hardly surprising, because the transcript of his interview shows that he was given both verbal and written *Miranda* warnings, which he deliberately and freely waived.  The transcript of the interview also contains no evidence that law enforcement coerced, intimidated, or deceived Mr. Williams into waiving these rights.  *See Locust*, 2011 U.S. Dist. LEXIS 142871, at *47 (analyzing whether *Miranda* waiver was freely and deliberately given or was obtained by "coercion, intimidation, or deception").  In fact, the transcript reflects that Mr. Williams had absolutely no reservations about waiving his rights and that he did not hesitate or ask any questions prior to waiving them.

Furthermore, in applying the "totality of the circumstances" test, there are no factors concerning Mr. Williams' age, mental condition, or education suggesting that he either did not understand his *Miranda* rights or the

97

consequences of waiving those rights or that his will was somehow overborne. In fact, the contrary is true: Mr. Williams' understanding of *Miranda* was evidenced by his statement to law enforcement that "everything could be used against me." *See* Exhibit L at 10. This is likely due to Mr. Williams' familiarity with the criminal justice system, which dates back to 1972 and includes at least 14 prior arrests and/or convictions for robbery, assault, and possession of controlled dangerous substances. *See, e.g.*, *United States v. Richardson*, 265 Fed. App'x 52, 56 (3rd Cir. 2008) (holding that suspect's familiarity with the criminal justice system, including a shoplifting incident and indecent exposure arrest counseled against a finding that suspect's confession was involuntary). Accordingly, the Court should find that Mr. Williams' *Miranda* waiver was lawfully obtained.

### C. Claude Williams' Statements Were Made Voluntarily and Were Not the Product of Coercion

The Court should likewise hold that Mr. Williams' statements, including his confession, were voluntarily made and not the product of coercion, deception, or intimidation. As a preliminary matter, there is no evidence that law enforcement "deprived [Mr. Williams] of food, sleep, or other physical needs that would otherwise . . . overbear a person's will." *Locust*, 2011 U.S. Dist. LEXIS 142871, at *51; *see also United States v. Graham*, Crim. No. 13-00011, 2014 U.S. Dist. LEXIS 88796, at *29 (N.D. Ga. May 28, 2014) (noting that coercive conduct "normally involves subjecting the accused to an exhaustingly

98

long interrogation, the application of physical force or the threat to do so . . .").
In fact, the entire interview took approximately 62 minutes, which is hardly an
"exhaustingly long" interview.  *Graham*, 2014 U.S. Dist. LEXIS 88796, at *29.

Instead, Mr. Williams focuses on what he terms "misleading legal advice."
Specifically, he claims his confession was coerced because law enforcement
officers offered him misleading legal advice regarding charge-bargaining and a
reduction in sentence pursuant to United States Sentencing Guideline
("USSG") § 5K.  However, the facts of the interview do not bear out Mr.
Williams' assertion.  Importantly, it was Mr. Williams who first raised the
specter of a lengthy sentence—not law enforcement.  *See* Exhibit L at 12.  It
was also Mr. Williams who sought to bargain with law enforcement, first by
asking whether the prosecutor would offer a specific sentence, and then by
offering to confess if law enforcement would let his co-conspirators go.  *See
infra*, at 24-25.  Thus, it can hardly be said that Mr. Williams sat passively
while law enforcement coerced or deceived him.  To the contrary, the record
suggests that Mr. Williams was actively engaged in the interview.

In addition, law enforcement told Mr. Williams on multiple occasions that
they could end the interview.  *See infra* at 27-28.  On each of these occasions,
however, Mr. Williams' response was to continue speaking with law
enforcement.  He never exercised his right to end the interview, and he never
told law enforcement that he wanted the assistance of counsel before the

99

interview proceeded any further.  On these facts, there is simply no evidence of police coercion.

Furthermore, when law enforcement officers discussed with Mr. Williams the possible array of charges he could face, they did not make him any "offer[s]" or otherwise engage in charge-bargaining, as Mr. Williams suggests. *See* Def. Motion to Suppress Statements at 9.  As detailed in the Statement of Facts, on more than one occasion during the interview, law enforcement was explicit that neither they nor the prosecutor could guarantee him a specific sentence.  *See infra* at 27.  In fact, Mr. Williams has conceded in his Motion to Suppress Statements his understanding that neither law enforcement nor the prosecutor was making any promises to him.  *See id.* at 8, 10 ("[T]he agents then reminded him that *it was up to the prosecutor to decide whether to charge him with every robbery*;" "the prosecutor . . . would decide what to charge;" "[t]he prosecutor can't even promise you a thing").

Nor was there was anything improper about law enforcement's discussion of the contours of the federal system, including the fact that (i) Mr. Williams could potentially get a reduction in his sentence if he accepted responsibility and that (ii) law enforcement would inform the prosecutor if Mr. Williams was cooperative with them and had accepted responsibility.  Law enforcement never misrepresented the nature or extent of Mr. Williams' legal rights and never made any unfulfillable promises or threats to him.  Contrary to Mr. Williams' assertions, these are precisely the types of statements that

100

have been approved by courts as acceptable law enforcement tactics. *Compare Arterberry*, 2001 U.S. App. LEXIS 32262, at *6-7 (a statement that a confession could "make a big difference" in the length of a prison sentence and be "very beneficial" to a defendant was not an improper promise of leniency and thus did not constitute coercion), *and Romano*, 2013 U.S. Dist. LEXIS 133613, at *5 (statements that "the best thing to do would be [to be] cooperative" that any cooperation "would be made known to the prosecutors and the judge" were not coercive), *with Graham*, 2014 U.S. Dist. LEXIS 88796, at *30-31 ("you must answer our questions," "whatever you say will be just between us" or "if you don't talk, you won't see your family for a very long time" all constitute the "kinds of deception" that are sufficient to "trigger suppression"); *see also United States v. Davis*, Crim. No. 05-54, 2006 U.S. Dist. LEXIS 3591, at *24-25 (D. Del. Jan. 30, 2006) (discussion of "legal consequences of the probable charge the defendant faced" in light of defendant's criminal record, "*regardless of whether it turn[ed] out to have been well-founded*," was insufficient to render confession coercive) (emphasis added).

What Mr. Williams calls a "cat-and-mouse" exchange is in reality nothing more than permissible psychological tactics. *See, e.g.*, *Henderson*, 2005 U.S. Dist. LEXIS 32897, at *31 ("[I]t is generally recognized that the police may use some psychological tactics in eliciting statements from a suspect."); *Graham*, 2014 U.S. Dist. LEXIS 88796, at *30 (noting that "trickery or deceit" is not a *per se* grounds to exclude a confession and that confessions). Nor were they

101

particularly harsh psychological tactics, either: for most of the interview, law enforcement and Mr. Williams treated each other respectfully. For example, Mr. Williams remarked that the officers had been "alright with me from the door;" he thanked law enforcement when they told him "you've been a gentleman;" and toward the conclusion of the interview Mr. Williams said "Thank you all for like, you know, I understand you all job." *See* Exhibit L at 37-38, 40.

Accordingly, there is no basis to find that Mr. Williams' statements, including his confession, were coerced. Absent this "crucial" prerequisite, the Court should hold that Mr. Williams' statements to law enforcement are admissible.

## VII.   CLAUDE WILLIAMS' STATEMENTS MADE DURING THE BOOKING PROCESS SHOULD BE ADMITTED AS SPONTANEOUS AND VOLUNTARY STATEMENTS

Even assuming *arguendo* that Mr. Williams' statements regarding counsel were clear invocations such that *Miranda* was violated, the statements that Mr. Williams made to law enforcement during the booking process, which occurred after the interview, should be admitted as spontaneous and voluntary statements.

### A. The Fruit-of-the-Poisonous-Tree Doctrine Does Not Apply to *Miranda* Violations

While it is true that statements made during the course of custodial interrogation must be suppressed in the absence of *Miranda* warnings, it does

not automatically follow that *all* statements made by a suspect subsequent to a *Miranda* violation are inadmissible. In *Oregon v. Elstad*, 470 U.S. 298 (1985), the Supreme Court held that *Miranda* violations that produce voluntary statements do not irrevocably taint any later confession. In *Elstad*, the suspect confessed to a burglary after a non-*Miranda* custodial interrogation in his residence. The suspect was then taken to police headquarters, where he was given *Miranda* warnings and then confessed again. The Supreme Court rejected the suspect's claim that the "simple failure to administer the [*Miranda*] warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Id.* at 309. Instead, the Court held that "the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id.*

The holding in *Elstad* is premised on the difference between violations of constitutional rights and violations of *Miranda*'s procedural safeguards. The former mandates a fruit-of-the-poisonous tree analysis to enforce the exclusionary rule and deter unconstitutional police conduct. *See Elstad*, 470 U.S. at 305-06. However, *Miranda*'s procedural safeguards are not contiguous with the Fifth Amendment's prohibition on compelled self-incrimination. *See id.* at 306 ("The *Miranda* exclusionary rule . . . may be triggered even in the absence of a Fifth Amendment violation."). Thus, when a violation of *Miranda*'s

103

procedural safeguards produces an otherwise voluntary statement there is no basis for conducting a fruit-of-the-poisonous-tree analysis to determine if evidence derived from that violation is "tainted" by the earlier (suppressible) statement.  *See United States v. DeSumma*, 272 F.3d 176, 180 (3d Cir. 2001) ("[T]he fruit of the poisonous tree doctrine does not apply to derivative evidence secured as a result of a voluntary statement obtained before *Miranda* warnings are issued.").

### B. Numerous Courts Have Refused to Suppress Subsequent, Spontaneous Statements Made by a Suspect Who Earlier Was Questioned in Violation of *Miranda*

Numerous courts have held that an antecedent *Miranda* violation does not taint a suspect's subsequent spontaneous and voluntary statements.  For instance, in *United States v. Cole*, 315 F.3d 633 (6th Cir. 2003), police officers stopped Cole and asked him whether he had discarded a gun from a vehicle in which Cole and others were riding.  Cole acknowledged that the gun was his but that someone else had discarded it.  *Id.* at 635.  During the booking process, Cole volunteered that the gun was his but protested what he perceived as unfair treatment.  *Id.* at 635-36.  The District Court held that Cole's response to the officer's question was inadmissible under *Miranda*, but it nonetheless admitted Cole's later, volunteered statement.  *Id.* at 636.

On appeal, the Sixth Circuit affirmed the District Court's ruling.  It agreed that statements spontaneously uttered by a suspect who is in custody are admissible under *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).  *See*

104

*Cole*, 315 F.3d at 636. And, it rejected Cole's claim that he had made only "one continuous statement which cannot be broken up into pieces which began from the initial question" by the officer. *Id.* Rather, the Sixth Circuit held that Cole had "clearly made multiple independent statements at the scene of his arrest, at the . . . Police Department, and on the way to the jail, even if their content was similar."[30] *Id.*; *see also United States v. Pettigrew*, 468 F.3d 626, 637-38 (10th Cir. 2006) (noting that the Supreme Court has rejected "application of the 'fruits' doctrine" to *Miranda* violation and holding that subsequent voluntary statements are admissible providing they are knowingly and voluntarily made); *United States v. Abdulla*, 294 F.3d 830, 837 (7th Cir. 2002); *Medeiros v. Shimoda*, 889 F.2d 819, 824-25 (9th Cir. 1989) (same); *United States v. Fautz*, 812 F. Supp. 2d 570, 640-41, 648 (D.N.J. 2011) (same) (collecting cases).

The Third Circuit has also held that a spontaneous incriminating statement made subsequent to a *Miranda* violation—even where that resulted in suppression of an earlier statement—is admissible. *See United States v. Bonner*, 469 Fed. App'x 119, 126-27 (3d Cir. 2012) (not precedential). In so holding, the court recognized that "[i]f Bonner's past statements were not the product of coercion, notwithstanding the police deception, *Elstad* teaches that

---

[30] The Sixth Circuit also rejected the notion that the fruit-of-the-poisonous-tree doctrine applied, noting that, because Cole's statements were "spontaneous and unprovoked" by the officers' initial questioning, "the initial *Miranda* violation furnishes no basis to suppress the subsequent statement." *Cole*, 315 F.3d at 637.

we should not suppress his May 14 statements, as they are not tainted by involuntariness." *Id.* at 127. Thus, the court ultimately ruled that the suspect's subsequent statement was not tainted, even assuming *arguendo* that the earlier ones were coerced. *See id.*

### C. Claude Williams' Voluntary and Spontaneous Statements Made During the Booking Process Should Be Admitted

As noted above, law enforcement informed Mr. Williams that they would be concluding the interview to start the booking process, and they then removed Mr. Williams from the interview room and took him to another area to begin the booking process. During this transition, Mr. Williams continued to make voluntary and spontaneous statements indicating that, in sum and substance, he wanted to take responsibility for his actions. These statements were entirely voluntary and were not made in response to any questioning by law enforcement. Nor were these statements the product of any coercion. Indeed, it is difficult to see where coercion could lie, given that law enforcement had terminated the interview and begun the booking process. Accordingly, because these statements were made voluntarily and spontaneously and were not in response to any questioning from law enforcement, they should be admitted, even assuming that Mr. Williams' prior statements regarding counsel constituted a clear request for counsel pursuant to *Miranda*.

## VIII.  THE REQUEST FOR EARLY JENCKS SHOULD BE DENIED

The defendant moves for disclosure of "early" Jencks material.  This argument is precluded by the plain language of the Jencks Act, 18 U.S.C. § 3500, and should be denied.

The Jencks Act, 18 U.S.C. § 3500, was enacted to set limits on pretrial discovery of witness statements in criminal cases, and, hence, it reflects a legislative determination that a criminal defendant is entitled to use such statements for impeachment purposes in cross-examination rather than in pretrial preparation.  *See Palermo v. United States*, 360 U.S. 343, 349 (1959); *United States v. Murphy*, 569 F.2d 771, 773 (3d Cir. 1978), cert. denied, 435 U.S. 955 (1978).   Under the Jencks Act itself, the Government must produce statements of its witnesses at least at the end of their direct examination.  18 U.S.C. § 3500.  Section 3500 specifically provides that:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a government witness or prospective government witness (other than the defendant) shall be the subject of subpoena [sic] discovery, or inspection until said witness has testified on direct examination in the trial of the case.

(emphasis added).

The Supreme Court and the Third Circuit have both held that Jencks Act material need not be produced until after the witness testifies at trial.  *Palermo*, 360 U.S. at 349; *United States v. Starusko*, 729 F.2d 256, 263 (3d Cir. 1984); *Murphy*, 569 F.2d at 773; *United States v. Kenny*, 462 F.2d 1205, 1212 (3d Cir.

1972), cert. denied, 409 U.S. 914 (1972).  The Third Circuit has repeatedly held that a district court cannot compel the Government to disclose statements of its witnesses before the conclusion of their direct examination. *United States v. Higgs*, 713 F.2d 39, 44-45 (3d Cir. 1983); *Murphy*, 596 F.2d at 773; *Kenny*, 462 F.2d at 1212.

In accordance with the Jencks Act, the Government will provide witness statements on Wednesday, September 24, 2014.

## IX.    THE DEFENDANT IS NOT ENTITLED TO ROUGH NOTES

Mr. Williams seeks a Court order compelling the Government to preserve "all rough notes, report drafts and final drafts" prepared by law enforcement, including FBI agents, in this case.  *See* Omnibus Motion at 14.  The Government is not required to disclose rough notes and draft reports prepared by law enforcement officers merely because Mr. Williams has demanded them. *See United States v. Brown*, 303 F.3d 582, 590 (5th Cir. 2002); *United States v. Muhammad*, 120 F.3d 688, 699 (7th Cir. 1997).  Accordingly, the Government objects to Mr. Williams' motion to the extent it seeks such rough notes and draft reports.

However, the federal agents involved in the prosecution of this case have been advised of their obligation to preserve notes of interviews and handwritten drafts of reports.  If directed by the court to do so, the Government will submit those materials to the Court for in camera review to determine whether disclosure is warranted.  *See United States v. Ammar*, 714 F.2d 238, 259 (3rd

108

Cir. 1983) ("[T]he government must retain and, upon motion, make available to the district court both the rough notes and the drafts of reports of its agents to facilitate the district court's determination whether they should be produced."); *United States v. Vella*, 562 F.2d 275, 276 (3rd Cir. 1977) (FBI agent's rough notes should be kept so that the trial court can determine whether they contain Brady or Jencks Act materials).

### X.    THE DEFENDANT IS NOT ENTITLED TO A *JAMES* HEARING

Mr. Williams seeks a pretrial hearing, commonly referred to as a "*James* hearing," to determine the existence of a conspiracy and the admissibility of co-conspirator statements.  More specifically, he seeks an order compelling the Government to require the existence of a conspiracy before the Government can introduce co-conspirator statements at trial.  For the reasons set forth below, Mr. Williams' request should be denied.

#### A. Co-Conspirator Statements Are Admissible as Non-Hearsay

Pursuant to Federal Rule of Evidence 801(d)(2)(E), an out-of-court statement is admissible as non-hearsay where the Government demonstrates by a preponderance of the evidence that:  (1) a conspiracy existed when the statement was made; (2) both the declarant and the defendant against whom the statement is offered were members of that conspiracy; and (3) the statement was made during the course of, and in furtherance of, the conspiracy.  *See* Fed. R. Evid. 801(d)(2)(E); *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987); *United States v. Bobb*, 471 F.3d 491, 498-99 (3rd Cir.

109

2006).  In making a factual determination of the admissibility of co-conspirator statements under this Rule, the Court may consider the statements themselves, as well as any other independent evidence of the conspiracy. *Bourjaily*, 483 U.S. at 180-81; *United States v. McGlory*, 968 F.2d 309, 333-34 (3rd Cir. 1992).

As to the first two elements, the Court need only find, after considering the statement itself and other evidence offered at trial, that the conspiracy existed by a preponderance of the evidence and that the declarant was more likely than not a co-conspirator.  *See McGlory*, 968 F.2d at 333-36; *United States v. Cruz*, 910 F.2d 1072, 1080-83 (3rd Cir. 1990).  As to the final element, the Third Circuit has explained that the "in furtherance" requirement has been given "a broad interpretation."  *United States v. Weaver*, 507 F.3d 178, 183 (3rd Cir. 2007) (quoting *United States v. Gibbs*, 739 F.2d 838, 845 (3rd Cir. 1984)).  For example, statements are made in furtherance of a conspiracy where:  they are direct to the purpose of the conspiracy, *Ammar* 714 F.2d at 253; they are "intended to promote the conspiratorial objectives of the conspiracy," *Weaver*, 507 F.3d at 184 (quoting *United States v. Reyes* 798 F.2d 380, 384 (10th Cir. 1986)); they merely inform the hearer about the status of the conspiracy, where the hearer is a co-conspirator; or they are intended to *conceal the conspiracy* so that the conspiracy can continue, in which case the hearer need not be a co-conspirator.  *See Weaver*, 507 F.3d at 181-87.

110

### B. The Third Circuit Has Never Required a Pre-Trial *James* Hearing

In determining whether a co-conspirator statement is admissible under Rule 801(d)(2)(E), the Third Circuit has never required district courts to hold a pre-trial *James* hearing.[31]  Thus, not surprisingly, Mr. Williams has not cited any case law—in the Third Circuit or otherwise—requiring a district court to hold a *pretrial James* hearing in order to determine the admissibility of co-conspirator statements.[32]  Rather, the Third Circuit has explained that co-conspirator statements may be introduced at trial "without a prior showing of a conspiracy based on independent evidence, subject to the requirement that the Government make such a showing *by the close of its case.*"  *Ammar*, 714 F.2d at 246 (emphasis added); *see also United States v. Gambino*, 926 F.2d 1355, 1360-61 (3rd Cir. 1991) (affirming admission of statements subject to later connection to conspiracy); *United States v. DePeri*, 778 F.2d 963, 981 (3rd Cir. 1986) (same).

The Third Circuit has explained that such a procedure accords with this Court's "control of the order of proof at trial," *United States v. Continental*

---

[31] *James* hearings are derived from the Fifth Circuit case *United States v. James*, 590 F.2d 575 (5th Cir. 1979).  Even the Fifth Circuit, however, does not require such pre-trial hearings.  Rather, that Court leaves the decision as to whether to hold such a hearing to the "discretion of the trial court." *United States v. Williams*, 264 F.3d 561, 576 (5th Cir. 2001).

[32] Mr. Williams correctly notes that the Court must determine whether a co-conspirator statement meets the requirements of Rule 801(d)(2)(E) before such statements can be admitted.  However, he cites no case law for his conclusion that "[a] preliminary hearing" is the "necessary" vehicle for making this determination.

111

*Group, Inc.*, 603 F.2d 444, 456 (3rd Cir. 1979), and avoids "unduly complex and confusing" alternatives in cases involving "interrelated testimony" of a continuing conspiracy, *id.* at 457, as well as the need to hold lengthy and time-consuming mini-trials.  *See Ammar*, 714 F.2d at 247; *Gambino*, 926 F.2d at 1360-61; *see also Boujaily*, 483 U.S. at 176 n.1 (refusing to opine on whether ruling needed to be made before trial).

In light of the case law, this Court should not hold a *James* hearing, as such hearing would amount to a time-consuming mini-trial outside the presence of the jury.  In addition, such a pre-trial hearing would force the Government to present much of its case-in-chief in order to show the declarant's role in the ongoing conspiracy—a presentation that will need to be almost identically rehashed before the jury shortly thereafter.  Furthermore, such a premature disclosure of the Government's case is unduly prejudicial, as it will give Mr. Williams an unjustified preview of its case.

At trial, the Government will make exactly the showing required under Rule 801(d)(2)(E).  That is, the Government will show by a preponderance of the evidence that any statements at issue here fall under Rule 801(d)(2)(E), as they (1) were made during a conspiracy, (2) by a declarant who was a member of the same conspiracy as Mr. Williams, (3) during the course of, and in furtherance of, that conspiracy.  *See Bobb*, 471 F.3d at 498-99.  Therefore, the Court should deny Mr. Williams' request for a pre-trial *James* hearing in favor of the procedure approved by the Third Circuit, which admits co-conspirator

112

statements pursuant to Rule 801(d)(2)(E) at trial, subject to later connection to an ongoing conspiracy.

## XI.   THE DEFENDANT'S *BRADY* AND *GIGLIO* MOTION IS MOOT

The Defendant moves for disclosure of exculpatory and impeachment material.  The Government acknowledges its obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), pursuant to which the Government must turn over, at the earliest possible time, any "evidence favorable to an accused . . . material either to guilt or to punishment."  *Id.* at 87.  Such exculpatory—that is, guilt negating—evidence goes to the heart of the defendant's guilt or innocence.  *Starusko*, 729 F.2d at 26; *Higgs*, 713 F.2d at 42.

The United States is fully aware of its obligation to disclose all such exculpatory material under *Brady* and this Court's discovery order.  The Government has turned over any such material known to it at this time.  Should any additional exculpatory material come into the Government's possession, it will be disclosed promptly.  Accordingly, no order requiring the Government to meet its obligations is necessary.

In addition to the disclosure of "guilt-negating" evidence, the Defendant also seeks early disclosure of impeachment materials and requests that the Court enter an order requiring the Government to review the personnel and internal investigation files of each law enforcement officer involved in the events leading to the Defendant's arrest.  The Government is fully aware of its

113

obligation to disclose evidence that may be used to discredit the testimony of critical government witnesses reasonably likely to change the jury's judgment. *Giglio v. United States*, 405 U.S. 150, 154 (1972); *see Starusko*, 729 F.2d at 260; *Higgs*, 713 F.2d at 43. *Giglio* impeachment material typically includes cross-examination materials such as immunity agreements, plea agreements, money paid to a witness, prior inconsistent statements, pending charges and criminal convictions. Because the Government understands its *Giglio* obligations and will comply with them fully, the Court need not enter an order requiring it.

The Defendant's demand for pretrial disclosure of such impeachment materials, however, is contrary to established law in this Circuit. Where material can only be used to challenge the credibility of Government witness—where it is *Giglio* material, in other words—the case law is clear that a defendant's right to a fair trial does not require pretrial production. In *Higgs*, the Third Circuit held that disclosure of witness credibility evidence at the time of trial is more than satisfactory:

> No denial of due process occurs if *Brady* material is disclosed to appellees in time for its effective use at trial. . . . The *Brady* material in this case was information that appellees could use on cross-examination to challenge the credibility of government witnesses. For that type of material, we think appellees' right to a fair trial will be fully protected if disclosure is made the day that the witness testifies. Disclosure at that time will fully allow appellees to effectively use that information to challenge the veracity of the government's witnesses.

114

*Higgs*, 713 F.2d at 44 (citations omitted).  Consistent with this view, federal courts routinely have refused to order pretrial production of *Giglio* materials.  *See, e.g.*, *United States v. Martino*, 648 F.2d 367, 384 (5th Cir. 1981) (en banc) (evidence concerning competency of key government witness provided at time he testified), *cert. denied*, 456 U.S. 949 (1982); *United States v. Rinn*, 586 F.2d 113, 119 (9th Cir. 1978), *cert. denied*, 441 U.S. 931 (1979); *United States v. Litman*, 547 F. Supp. 645, 653 (W.D. Pa. 1982), *aff'd*, 661 F.2d 17 (3d Cir. 1983); *United States v. Frumento*, 405 F. Supp. 23, 32 (E.D. Pa. 1975) (refusing to order pretrial disclosure of criminal records).

The United States recognizes the interest of the Court and all parties to conduct the trial efficiently and without interruptions.  The United States will disclose all *Giglio* material in its possession at the same time it produces Jencks Act material.  This procedure should be more than adequate to afford defense counsel time to prepare for cross-examination and to prevent unnecessary delays in the trial.

## XII.  ANY FURTHER MOTIONS SHOULD BE LIMITED TO ADDITIONAL DISCOVERY

As a preliminary matter, the Government disputes Mr. Williams' characterization of this case as involving "complicated" legal issues.  As stated herein, there is clear precedential Third Circuit case law that disposes of much, if not all, of the defendant's arguments regarding both cell-site records and the

115

admissibility of his statements made to law enforcement.  In addition, the sole case that Mr. Williams relies upon has been vacated.

Nonetheless, the Government has no objection to Mr. Williams' request for leave to file additional motions related to issues raised by Government disclosures made after August 20, 2014, the date that the defendant filed his numerous pre-trial motions.

### CONCLUSION

For all of the foregoing reasons, the Government submits that the Court should deny the pre-trial motions of defendant Claude Williams.

Respectfully submitted,

PAUL J. FISHMAN
United States Attorney

By:  _____

OSMAR J. BENVENUTO
COURTNEY M. OLIVA
Assistant United States Attorneys

Dated:  September 4, 2014
Newark, New Jersey

116